[Cite as *Di v. Cleveland Clinic Found.*, 2016-Ohio-686.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 101760

## XIAO DI, M.D., ET AL.

PLAINTIFFS-APPELLEES

vs.

## CLEVELAND CLINIC FOUNDATION, ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED IN PART,
REVERSED IN PART AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-13-806377

**BEFORE:** E.A. Gallagher, P.J., Boyle, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** February 25, 2016

**ATTORNEYS FOR APPELLANTS**

Joseph E. Herbert
Anna Moore Carulas
Roetzel & Andress L.P.A.
1375 E. Ninth Street
One Cleveland Center 9th Floor
Cleveland, Ohio 44114

Douglas G. Leak
Hanna, Campbell & Powell, L.L.P.
3737 Embassy Parkway
Suite 100
Akron, Ohio 44333

**ATTORNEYS FOR APPELLEES**

Stephen S. Crandall
Crandall Law L.L.C.
15 ½ N. Franklin Street
Chagrin Falls, Ohio 44022

Paul W. Flowers
Paul W. Flowers Co. L.P.A.
Terminal Tower, 35th Floor
50 Public Square
Cleveland, Ohio 44113

Richard C. Haber
Haber, Polk & Kabat, L.L.P.
737 Bolivar Road
Suite 4400
Cleveland, Ohio 44115

Norman A. Moses
Crandall Law L.L.C.
100 Marwood Circle
Boardman, Ohio 44512

EILEEN A. GALLAGHER, P.J.:

{¶1} Defendants-appellants the Cleveland Clinic Foundation ("the CCF") and Dr. Andrew Esposito appeal from a medical negligence judgment in the Cuyahoga County Court of Common Pleas in favor of plaintiffs-appellees, Dr. Xiao Di and Nan Qiao. Appellants argue that various errors at trial require either a judgment notwithstanding the verdict or, in the alternative, a new trial on the medical negligence claim. Appellees cross-appeal, arguing that in the event that a new trial is ordered, all claims including those for which a defense verdict was returned at trial must be remanded for a new trial. For the following reasons, we affirm, in part, and reverse, in part.

{¶2} Appellees filed a complaint pertaining to injuries to Dr. Di's left eye and raised claims of medical negligence against Dr. James Kim and claims of medical negligence, lack of informed consent, battery and alterations of records against Dr. Andrew Esposito. Dr. Di's wife, Nan Qiao, asserted a claim for loss of consortium. The CCF, as the employer of Doctors Kim and Esposito, was also named as a defendant on all counts.

{¶3} Dr. Di's claim against Dr. Kim arose subsequent to an injury Dr. Di suffered to his left eye while he was performing a spine surgery at the CCF. Dr. Di asserted that Dr. Kim, the on-call opthalmalogist at that time, violated the standard of care by failing to properly respond to his request for treatment.

{¶4} Dr. Di's claims against Dr. Esposito arose from a surgery conducted by Dr. Esposito on Dr. Di's left eye at the CCF nearly a year later. Dr. Di claimed that Dr. Esposito performed the surgery in violation of the standard of care. Dr. Di further asserted

that Dr. Esposito performed surgery on his iris without his informed consent, thus committing a battery, and that Dr. Esposito altered the relevant records to conceal this fact.

{¶5} The case proceeded to a jury trial and the jury returned a verdict in favor of Dr. Kim and in favor of Dr. Esposito on Dr. Di's claims of lack of informed consent, battery and alteration of records. However, the jury found in favor of Dr. Di on his medial negligence claim against Dr. Esposito and returned a verdict of $7,200,000. The jury also found in favor of Nan Qiao on her loss of consortium claim and awarded her $500,000. The trial court reduced Dr. Di's noneconomic damages by $500,000 pursuant to R.C. 2323.43 in its entry of judgment.

{¶6} Following the trial, appellants filed a motion to enforce the statutory cap on Dr. Di's noneconomic damages, a motion for judgment notwithstanding the verdict and a motion for new trial. The trial court denied appellants' motions on July 28, 2014 and this appeal followed.

{¶7} The following relevant evidence was adduced at trial:[1]

{¶8} Dr. Di entered into a fellowship with the CCF in 2003 and was added to the staff as a neurosurgeon following his fellowship in 2006. Dr. Di specialized in endoscopic surgery and performed 150 to 200 procedures annually. Dr. Di's left eye was injured when struck by a bone fragment during surgery on February 12, 2010. Dr.

---

[1]We limit our recitation of facts to only those facts relevant to Dr. Di's medical negligence claim against Dr. Esposito because all other claims resulted in a defense verdict and are not relevant to this appeal.

Di's eye improved in the weeks following the injury but, in September of 2010, he consulted his primary care physician due to gradually decreasing visual acuity in the eye.

{¶9} Dr. Di began consulting with Dr. Esposito, an ophthalmologist working as a part time consultant for the CCF, on December 10, 2010. Records from December 10, 2010 and a January 11, 2011 visit with Dr. Esposito indicate that Dr. Di was suffering from blurry vision. Dr. Di had a visually significant cataract as well as a corneal scar and an iris adhesion. The iris adhesion was described as Dr. Di's iris "tenting" or "plugging" a corneal laceration likely acquired from his February 12, 2010 injury. Dr. Di's pupils were reactive to light and able to constrict indicating that the sphincter muscle in his pupil was intact prior to the eye surgery.

{¶10} On January 14, 2011, Dr. Esposito performed surgery to remove Dr. Di's cataract and repair his iris. All parties agree that the cataract portion of the surgery was a success. In attempting to repair Dr. Di's iris adhesion, Dr. Esposito used a cyclodialysis spatula to "tint the iris away from the back surface of the cornea." Dr. Esposito then used endoshears to dissect the scarred iris tissue from the cornea. Dr. Esposito's operative note reports that "at this point, about 2-3 o'clock iris defect was noted." Dr. Esposito attempted to close the defect with two stitches but was unsuccessful and aborted the procedure.

{¶11} Following the surgery, Dr. Esposito met with Dr. Di's wife Nan Qiao. She testified that Dr. Esposito indicated that Dr. Di's iris had been torn during the attempt to remove the corneal scar. Dr. Esposito indicated that problem could be addressed with stitches after the swelling from the procedure receded in a few months.

**{¶12}** Dr. Di met with Dr. Esposito after the surgery and Dr. Esposito indicated that he had accidentally torn Dr. Di's iris during the surgery but that he could fix it. Following the surgery, Dr. Di reported that he suddenly began experiencing glare, photophobia and ghost images. Prior to surgery his only symptom was blurry vision.

**{¶13}** Concerned about his new symptoms, Dr. Di was referred to Dr. Kosmorsky, an ophthalmologist with the CCF. A record of Dr. Di's January 17, 2011 consult with Dr. Kosmorsky reported that Dr. Di was suffering from blurred and double vision, dizziness and a headache.

**{¶14}** In describing Dr. Di's surgery, Dr. Kosmorsky initially wrote in a draft that Dr. Di's eye had been "macerated" but withdrew this language. Dr. Kosmorsky later wrote a letter stating the following:

> Dr. Xiao Di has been under my care for a complicated cataract surgery performed on his left eye on 1/14/2011. He sustained iris damage during the surgery and now has an eccentric pupil that is causing ghosting and refractive halos. Additionally, he has an acquired astigmatism that will likely require refractive surgical correction, and this will need to wait at least several months for the cataract surgery to heal completely. In the interim he has lost his depth perception and this will make it impossible for him to work as a neurosurgeon until and unless he heals to the point of regaining stero [sic] visual acuity. It is anticipated that his final vision outcome will not be determined for another 3 months at which time a judgment can be made as to whether or not he will be capable of performing the kind of fine visual tasks required of a neurosurgeon.

**{¶15}** Dr. Di testified that Dr. Kosmorsky refused to operate further on his iris to fix the post-surgery defect because it could not be fixed. During his course of post-surgery treatment with Dr. Kosmorsky, Dr. Di attempted to use a piggyback lens to address his symptoms but he was unable to tolerate it. Finally, Dr. Kosmorsky testified

that, on June 13, 2011, it was decided that the best remaining option was for Dr. Di to use a colored contact lens to completely block out the vision in his left eye. At the time of trial, Dr. Di remained monocular.

{¶16} At trial, five ophthalmologists offered varying opinions on the condition of Dr. Di's left eye and the cause of his vision problems. Dr. George Corrent, an ophthalmologist with the Bascom Palmer Eye Institute in Florida consulted with Dr. Di about potential solutions to his vision problems. He found that Dr. Di had a corneal scar with some astigmatism that had caused an irregularity in the shape of Dr. Di's cornea. He further stated that Dr. Di's iris was damaged and did not respond to light. Dr. Corrent concluded that these problems were minor in comparison to what he saw as the major problem with Dr. Di's eye: changes in the left optic nerve. Dr. Corrent stated that treatments could improve some of Dr. Di's problems but no intervention would fix his optic nerve and restore sufficient vision for him to have good depth perception. Dr. Corrent did not offer an opinion on the cause of the damage to Dr. Di's optic nerve.

{¶17} Dr. Marc Abrams, an ophthalmologist with 29 years of experience in private practice, including iris surgery, testified as an expert for Dr. Di. He agreed with Dr. Kosmorsky's assessment from the above-quoted letter, which indicated that Dr. Di had sustained iris damage during his eye surgery. He further agreed with Kosmorsky's assessment that the iris damage was causing Dr. Di to experience ghosting and reflective halos and that Dr. Di had lost the depth perception necessary to work as a neurosurgeon. Dr. Abrams explained that Dr. Di currently has a "sector defect" in his eye that lets in too much light leading to fluctuating vision from glare and brightness.

**{¶18}** Dr. Abrams opined that Dr. Di did not have an iris defect of any kind prior to his eye surgery. He explained that although the records reflect that Dr. Di had a corneal scar with iris tenting, the tenting was not causing any of Dr. Di's decreased visual acuity. Abrams testified that the sole cause of Dr. Di's decreased visual acuity prior to surgery was the cataract. Dr. Abrams further confirmed that medical records established that the sphincter muscle in Dr. Di's eye was intact prior to surgery and allowed his pupils to react to light and constrict.

**{¶19}** Dr. Abrams testified that, in his opinion, Dr. Esposito had cut Dr. Di's sphincter muscle during the removal of the iris from the cornea and created the sector defect. He stated that Dr. Di did have a functional pupil but the surgery left him without one. Dr. Abrams stated that Dr. Di now has a "giant area that doesn't restrict, it's just really not a pupil." Dr. Abrams explained that the pupil is important because "[it] regulates the amount of light coming in. If you can't regulate the light coming in and if all the light just comes pouring in, you get ghost imaging, sometimes double vision * * *."

**{¶20}** Dr. Abrams testified that it was below the standard of care for Dr. Esposito to attempt to repair Dr. Di's iris because it didn't need to be fixed, stating: "Going after the iris almost a year after a trauma was doomed to failure." Dr. Abrams explained that the iris tissue trapped in the cornea was already dead due to a lack of blood supply. He stated that:

> The only way to get the iris from being tented up is to basically dissect it away, which creates a huge defect in the iris, which is what happened here. He didn't have a defect. He had a tenting-up position of the iris, but it did block the light from coming in. By doing this, by basically amputating the iris away from the cornea * * *.

* * *

[N]ow the iris is literally peeled back away from where it should be, and that leaves —  it's like a door that's being held wide open * * *.

**{¶21}** Dr. Abrams concluded that by attempting to amputate the iris and repair it, Dr. Esposito destroyed Dr. Di's pupil.  Dr. Abrams stated that it was a deviation of the standard of care to attempt the iris reconstruction because it was not a logical, reasonable approach and would not work in light of the extended period of time that had passed since Dr. Di's initial injury.  Dr. Abrams opined that the negligence of Dr. Esposito directly and proximately caused injury to Dr. Di and had rendered his eye relatively useless visually due to glare and photophobia.  He further stated that Dr. Di lacked good depth of vision due to the loss of vision in his left eye.

**{¶22}** Dr. Carl Asseff, a private ophthalmologist with experience performing approximately 1,000 iris surgeries, also testified on behalf of Dr. Di.  He agreed with Dr. Abrams' assessment that Dr. Di did not have an iris defect prior to the eye surgery but instead had an iris adhesion that was plugging a laceration wound in his cornea.  He also testified that Dr. Di's sphincter and radial muscles were intact prior to surgery because Dr. Di's eye was able to dilate.  Dr. Asseff opined that prior to the eye surgery, the tenting of Dr. Di's iris was not affecting his vision in any way and was not a problem. According to Dr. Asseff, Dr. Di's only pre-surgery symptom, blurry vision, was due to the cataract.

**{¶23}** Dr. Asseff testified that when Dr. Esposito attempted to remove Dr. Di's iris from the scar, the iris was severed and dramatically pulled away from the iris root and blood supply resulting in the death of that tissue.  Dr. Di's pupil sphincter was also cut.

According to Dr. Asseff, today Dr. Di has a massive opening in his iris resulting in ghost images from light, constant glare and photophobia.

{¶24} Dr. Asseff rejected the defense theory that Dr. Di's symptoms were pre-existing and are only now visible due to the removal of the cataract the presence of which had prevented their detection. Dr. Asseff explained that Dr. Di did not have any of the symptoms before the eye surgery. Dr. Di's iris possessed 95 percent functionality and efficiency before the surgery and his pupil was able to constrict and reduce the amount of light that entered his eye. After the surgery, Dr. Di lost approximately 40 percent of his iris tissue and has no sphincter muscle, resulting in massive amounts of light entering his eye.

{¶25} Dr. Asseff opined that Dr. Esposito should have performed only the cataract operation because Dr. Di's iris injury was not salvageable at the time of surgery. Dr. Asseff further opined that, had Dr. Esposito done only the cataract operation, Dr. Di would still be performing neurosurgery today and would not suffer from photophobia, glare and ghost imaging. Finally, Dr. Asseff concluded that Dr. Di had lost depth perception, was unable to perform the duties of a neurosurgeon and his vision problem could not be fixed.

{¶26} Dr. Kosmorsky testified that Dr. Di had an iris defect prior to the eye surgery. However, he conceded that none of his own records and notations from treating Dr. Di attributed his post-surgery vision problems to anything other than the eye surgery. In contrast to his earlier letter describing Dr. Di's eye injury, at trial Dr. Kosmorsky attributed Dr. Di's vision problems to a pre-existing iris defect. He asserted that the

reason that Dr. Di only began to experience glare, photophobia and ghost images immediately following the eye surgery was because the cataract had been masking these symptoms by blocking light out of Dr. Di's eye.

{¶27} Dr. Kosmorsky's differential diagnosis for Dr. Di included amblyopia possibly caused by a congenital optic nerve abnormality, conversion disorder and an ulterior motive, i.e., that Dr. Di was faking the injury. In contrast to this opinion, defendant-appellant Dr. Esposito conceded Dr. Di's eye is injured and he is not faking. In fact, Dr. Kosmorsky admitted that after surgery Dr. Di's sphincter muscle in the relevant section of his iris had been completely cut to the pupil despite documentation from Dr. Esposito that it had been intact prior to surgery. Dr. Kosmorsky further conceded that despite numerous opportunities during the treatment of Dr. Di, no ophthalmologist for the CCF ever diagnosed Dr. Di with either amblyopia or a congenital optic nerve abnormality.

{¶28} Dr. Asseff rejected Dr. Kosmorsky's differential diagnosis of latent amblyopia and a congenital optic nerve defect because there was no documentation of damage prior to the surgery. He additionally opined that, "hypothetically," if Dr. Di now has optic nerve damage, such damage was sustained during the trauma of the eye surgery due to increased intraocular pressure.

{¶29} Finally, Dr. Michael Snyder, an ophthalmologist who specializes in cornea and refractive surgery for the Cincinnati Eye Institute, testified for the appellants. Dr. Snyder testified that Dr. Di had a defect in his iris and damage to his pupil prior to the eye surgery due to a corneal laceration. Dr. Snyder opined that Dr. Di did not see glare or

photophobia until after the surgery because of the cataract and his iris being incarcerated in the corneal wound resulted in a blockage of light. Dr. Snyder testified that the cataract was masking problems such as light sensitivity and multiple images that Dr. Di did not notice until the cataract was removed.

{¶30} Dr. Snyder agreed with Dr. Esposito's decision to attempt the iris reconstruction surgery and testified that he would have made the same choice. Dr. Snyder testified that Dr. Esposito was competent and qualified to make the surgical recommendation and perform the surgery. However, Snyder conceded that "it is very difficult, almost impossible, to remove the iris from the scar where it has become entrapped." Despite this, Dr. Snyder maintained he would have performed the surgery because if Dr. Di's iris had been left plugging the corneal wound, he would continue to be at risk for photophobia and glare.

{¶31} Dr. Snyder testified that it is impossible to predict how a patient's iris will react to this type of surgery and a perfect outcome cannot be guaranteed. Dr. Snyder testified that a perfect outcome was not achieved in Dr. Di's case and that while Dr. Di had a pre-surgery iris abnormality the abnormality was enlarged by the surgical intervention. He further conceded that light was entering Dr. Di's eye through this larger aperture and that while Dr. Di's pupil had been reactive to light prior to surgery, afterward the pupil showed minimal reactivity.

{¶32} Dr. Snyder testified that the present defects in Dr. Di's eye could be addressed with various treatments including a contact lens designed to limit the amount of light that enters the eye, an artificial iris and a corneal transplant. Dr. Abrams disagreed

with Dr. Snyder's opinion and testified that Dr. Di's iris defect could not be fixed with a jupiter lens, a corneal transplant or an artificial iris transplant. He explained that a corneal transplant would not address Dr. Di's iris defect and an artificial iris is not a device approved by the FDA. He further opined that an artificial iris would be contraindicated in Dr. Di's case because it would increase his risk to suffer intractable glaucoma. Dr. Snyder maintained that Dr. Abrams' concerns regarding the artificial iris were factually incorrect.

{¶33} Finally, Dr. Snyder testified that he examined Dr. Di's left optic nerve after the eye surgery and did not find the nerve to be damaged. However, Dr. Snyder repeatedly described the nerve as "funny looking." While not opining that Dr. Di's optic nerve was the cause of his present vision problems, Dr. Snyder testified that the nerve had an abnormal shape from development in utero. He further maintained that the shape of the nerve does not change based on intervention and that the eye surgery did not cause damage to Dr. Di's optic nerve.

{¶34} The record reflects that the CCF chose not to renew Dr. Di's employment contract after 2010 in a decision that was completely unrelated to his eye injury. It was established that Dr. Di was a fellow at the CCF from 2003 to 2006 and then a clinical associate from 2006 until the end of his employment in 2011. Dr. Di's annual salary was $150,000 from 2003 until April 1, 2010. In April 2010 the CCF increased Dr. Di's salary to $300,000. The record reflects that the average annual salary for a staff level neurosurgeon at the CCF was $475,000. CCF witnesses maintained that Dr. Di's value

was beneath "staff level" because he was ineligible for board certification in neurosurgery due to his education and training outside the United States.

{¶35} In anticipation of his annual contract not being renewed with the CCF, Dr. Di obtained a neurosurgery position at the Children's Mercy Hospital in Missouri with an annual salary of $480,000. Dr. Di's ability to obtain a license to practice medicine in the state of Missouri was uncertain and in the process of being appealed when he underwent eye surgery. Due to his vision problems subsequent to the surgery, he was forced to withdraw from his contract with Children's Mercy Hospital because he could not operate as a neurosurgeon.

{¶36} Dr. Di's economic damages expert, Dr. David Boyd, detailed his calculations of Dr. Di's future lost wages due to his inability to operate as a neurosurgeon following the eye surgery. Dr. Boyd presented alternative calculations based on different work life expectancy figures and salaries of $300,000 and $475,000.

{¶37} Lastly, Dr. Di's wife, Nan Qiao, testified and described the detrimental impact that Dr. Di's eye injury had upon their family.

**I. Motion for Judgment Notwithstanding the Verdict**

{¶38} Appellants argue in their first assignment of error that the trial court erred in denying their motion for a judgment notwithstanding the verdict.

{¶39} Review of a trial court's ruling on a motion for judgment notwithstanding the verdict is de novo, because it presents a question of law. *Seese v. Admr., Bur. of Workers' Comp.*, 11th Dist. Trumbull No. 2009-T-0018, 2009-Ohio-6521, ¶ 11. We

review the denial of a motion for judgment notwithstanding the verdict under the following standard:

> The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.

*Posin v. A.B.C. Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976).

**{¶40}** A motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence. This is a question of law that does not require the reviewing court to weigh the evidence or test the credibility of witnesses. *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982).

**{¶41}** Appellants argue that the evidence presented at trial was legally insufficient to support the jury's verdict and they cite the jury's response to interrogatory number 7 that asked in what respect Dr. Esposito was negligent. The jury answered as follows:

> [D]id not meet the required standard of care.

> Attempted a surgery he was not qualified to preform [sic].

**{¶42}** The Ohio Supreme Court has repeatedly approved the use of interrogatories requesting the jury to state "in what respects the defendant was negligent." *Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 77. The essential

purpose to be served by interrogatories is to test the correctness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial. *Cincinnati Riverfront Coliseum, Inc. v. McNulty Co.*, 28 Ohio St.3d 333, 336-37, 504 N.E.2d 415 (1986).

{¶43} Here, appellants argue that the jury's response to interrogatory number 7 was legally insufficient to support the jury's verdict because Dr. Di presented no expert testimony that Dr. Esposito was unqualified to perform the iris reconstruction or that a lack of qualifications caused Dr. Di's injury. We do not agree.

{¶44} Appellants' argument is flawed in two respects. First, appellant asks this court to completely ignore the first sentence in the jury's response to the interrogatory — that Dr. Esposito "did not meet the required standard of care." Even if we were to accept appellants' argument that the jury's second sentence was not supported by the evidence, the jury heard sufficient testimony from Dr. Abrams and Dr. Asseff detailing a violation of the standard of care by Dr. Esposito and establishing that such violation proximately caused Dr. Di's injury. Assuming arguendo that the second sentence represents a flawed rationale in support of medical negligence, the first sentence stands, by itself, as an independent and adequate explanation of the negligence determination. The jury's first stated rationale for its negligence finding— that Dr. Esposito violated the standard of care — is supported by sufficient evidence on the record.

{¶45} Second, we reject appellants' strict and narrow construction of the jury's second sentence, "[a]ttempted a surgery he was not quailfied [sic] to preform [sic]." In *Prendergast v. Ginsburg*, 119 Ohio St. 360, 164 N.E. 345 (1928), the Ohio Supreme

Court held that, "[j]udgment should not be rendered on special findings of fact as against the general verdict unless such special findings, when considered together, are inconsistent and irreconcilable with the general verdict." *Id*. at paragraph one of the syllabus. Jury interrogatory answers should be liberally construed with a view to ascertaining the jury's reason for its verdict. *Elio v. Akron Transp. Co.*, 147 Ohio St. 363, 370, 71 N.E.2d 707 (1947). Neither the court nor counsel may put words into the mouths of the jury. *Id*.

{¶46} Over the course of a 13 day trial, the jury heard conflicting testimony from five ophthalmologists regarding the damage to Dr. Di's eye, the cause of said damage and the relevant standard of care. In addition to that information, the jurors heard evidence regarding Dr. Di's claims against Dr. Kim and they were inundated with a massive quantity of specialized medical information. Appellants now argue that this court should reverse the jury's verdict because their interrogatory response failed to strictly conform to the proper use of legal and medical terminology. We decline to adopt appellants' strict construction approach to a layperson jury's description of medical negligence.

{¶47} There is no dispute that appellant introduced sufficient expert evidence that Dr. Esposito violated the standard of care by performing an unnecessary and unlikely to succeed surgical procedure (the iris reconstruction). Furthermore, Dr. Di introduced sufficient expert evidence to establish that this unnecessary procedure proximately caused the damage to his iris. In a situation such as this, where the record contains sufficient evidence to establish medical negligence, we decline to interject ourselves into the minds of the jury and apply strict legal meaning to ambiguous terminology and overturn their

verdict. We do not find Dr. Di's theory of negligence, that Dr. Esposito erred in deciding to engage in an unnecessary and risky surgical course, to be patently inconsistent with the jury's finding that he engaged in a surgery he was not qualified to perform.

**{¶48}** Appellants' first assignment of error is overruled.

### II. Trial Court's Admission of Employment–Related Evidence

**{¶49}** Appellants argue in their second assignment of error that the trial court erred in allowing Dr. Di to introduce evidence pertaining to his employment with CCF. Appellants argue that the testimony of certain witnesses and the introduction of a letter evidencing neglect of Dr. Di's compensation by his employer constituted inflammatory and irrelevant evidence.

**{¶50}** "Relevant" evidence is defined by Evid.R. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." All relevant evidence is admissible and irrelevant evidence is inadmissible. Evid.R. 402.

**{¶51}** "Decisions concerning the admission or exclusion of evidence are within the discretion of the trial court and will not be reversed absent an abuse of that discretion." *Smith v. Gold-Kaplan*, 8th Dist. Cuyahoga No. 100015, 2014-Ohio-1424, ¶ 17, citing *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323. A trial court's determination of the relevance of any evidence is also reviewed for an abuse of discretion. *State v. Allen*, 73 Ohio St.3d 626, 633, 653 N.E.2d 675 (1995). A reviewing court will uphold an evidentiary decision absent an abuse of discretion that has affected the substantial rights of the adverse party or is inconsistent with substantial

justice. *Beard* at ¶ 20.  The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶52}** Appellants argue that the trial court abused its discretion in allowing Dr. Di to call Dr. Michael Modic, Dr. Marc Luciano and Dr. Edward Benzel as witnesses. We disagree.  The testimony of all three doctors was relevant to establish Dr. Di's future earning capacity, his capabilities as a surgeon and his ability to function as a neurosurgeon in the future.

**{¶53}** Dr. Michael Modic's testimony established that a staff level neurosurgeon at the CCF has an average salary of $475,000.   Dr. Marc Luciano was Dr. Di's immediate supervisor at the CCF and established that Dr. Di was considered one of the leading neurosurgeons in the United States regarding endoscopic chiari surgery during his time at the CCF.   He confirmed that he wrote a letter of recommendation for Dr. Di and that Dr. Di was a very good physician and a mature technical neurosurgeon who possessed good judgment.

**{¶54}** Appellants and Dr. Di took opposing positions at trial on the question of whether Dr. Di could continue to function as a monocular neurosurgeon.   No testimony was more relevant to this issue than that of Dr. Edward Benzel.   Dr. Benzel testified that he had been the chairman of neurosurgery at the CCF since 2007.   He testified that he disagreed with Dr. Kosmorsky's opinion that Dr. Di was unable to function as a neurosurgeon due to a loss of depth perception, explaining that "a lot" of Dr. Di's surgery

involves interpreting images displayed on a two dimensional television screen. However, he conceded that complications during endoscopic procedures can require a neurosurgeon to convert the procedure to an open procedure that would require depth perception and that endoscopic procedures in general require depth perception to place the endoscope in the patient's body.

{¶55} Nonetheless, Dr. Benzel maintained that Dr. Di's monocular vision would suffice for neurosurgery. When pressed for an explanation, Dr. Benzel stated that depth perception is "tactile, visual, other cues, et cetera." This was the most significant testimony introduced at trial on the subject of Dr. Di's future capability as a neurosurgeon because it is likely that the jury found this explanation to be lacking in credibility. The record established that Dr. Di was monocular and lacked vision in his left eye for depth perception. The record further established the incredibly delicate and precise nature of Dr. Di's surgeries that required him to operate in spaces as small as one millimeter and where mistakes can result in the death of a patient. Within that context, it is difficult to accept Dr. Benzel's claim that "tactile" sense would be sufficient for such surgeries.

{¶56} Dr. Benzel also provided testimony regarding Dr. Di's appropriate salary and value in the market as a neurosurgeon. His testified that Dr. Di's salary for the majority of his time at the CCF, $150,000 per year, was appropriate because Dr. Di's value as a non-board certified surgeon was "low." However, this testimony was directly contradicted by an internal email indicating that Dr. Di had been underpaid. It was also refuted by Dr. Di's ability to obtain a contract for his services at the Children's Mercy Hospital in Missouri with an annual salary of $480,000.

**{¶57}** Furthermore, Dr. Benzel questioned Dr. Di's skill, stating that a letter of recommendation that he, himself, had written that included effusive praise of Dr. Di was not accurate. In testimony that likely damaged his credibility, Dr. Benzel maintained that despite his praise and the well established unique character of Dr. Di's neurosurgical practice, Dr. Di was merely an "adequate surgeon." Dr. Benzel explained that his effusive letter of recommendation contained a "code word" in the form of the phrase: "[s]hould you have any further questions or concerns, please do not hesitate to contact me." Regarding prospective employers who relied on the veracity of his statements of praise in the letter, Dr. Benzel stated "[i]f you don't call me, you're bad."

**{¶58}** Due to the plethora of relevant testimony introduced during the questioning of the above witness we cannot say that the trial court abused its discretion in allowing Dr. Di to call them as witnesses.

**{¶59}** Finally, appellants argue that the trial court erred in allowing Dr. Di to introduce an April 1, 2010 internal CCF email written by Dr. Modic that stated "believe it or not [Dr. Di] was hired at 150k and never given a raise [from 2006 to 2010]." The letter indicated that Dr. Di was "actually a good surgeon but not board eligible and * * * not part of our long term planning." In anticipation of transitioning Dr. Di's work to a newly recruited pediatric neurosurgeon at the end of 2010, Dr. Modic stated:

> I would like to increase his compensation to 300k year [sic] starting in May for his cooperation in staying with us through the transition, even though we were not going to reappoint him. (Might also get us off the hook if he sues his [sic] under the US anti slavery laws). I know we are in a compensation budget crunch but he has been mistreated. My only excuse, and a lame one at that, is that he has been under my radar as a clinical associate.

**{¶60}** The trial court initially ruled that the email would be excluded from trial and, consistent with this ruling, it was not introduced during the testimony of Dr. Modic. However, when Dr. Di's economics expert, Dr. Boyd, provided testimony regarding his future lost wages based on alternative annual salaries of $300,000 and $475,000, appellants challenged these salary figures. Appellants forced Dr. Boyd to concede that Dr. Di had never earned $300,000 for a full year but rather his W-2 forms indicated salaries in the $150,000 range. Further questioning by appellants' attorney suggested that Dr. Boyd's economic damages calculations should be cut in half based on this information.

**{¶61}** Following an objection by Dr. Di, the trial court reversed its decision to exclude Dr. Modic's email and allowed it to be introduced during the testimony of Dr. Benzel who described it as "a joke."

**{¶62}** In *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, this court explained:

> Under the "opening the door doctrine," where a party has elicited or introduced prejudicial or inadmissible testimony, his opponent, in the trial court's discretion, may introduce evidence on the same issue in order to rebut any false impression that may have resulted from the earlier admission. A prerequisite of any view regarding "opening the door" is that the initial evidence was somehow prejudicial to the party attempting to present rebuttal evidence.

(Internal citations omitted.) *Id.* at ¶ 122

**{¶63}** A party may use relevant information to rebut the inference arising from evidence when a party opens the door to otherwise inadmissible evidence. *State v. Battiste*, 8th Dist. Cuyahoga No. 102299, 2015-Ohio-3586, ¶ 33, citing *State v. Jackson*,

57 Ohio St.3d 29, 565 N.E.2d 549 (1991). This court has applied the "opening the door" doctrine in the context of civil trials. *See, e.g., Spisak v. Salvation Army*, 8th Dist. Cuyahoga No. 99633, 2013-Ohio-5429, ¶ 53.

**{¶64}** We find no error in the trial court's application of the doctrine in this instance. Appellants were fully capable of introducing independent testimony on the topic of Dr. Di's future market value and instead chose to take advantage of the trial court's initial decision to exclude the letter. The record contained significant evidence that Dr. Di's market value was greater than $150,000 per year. Despite this fact, appellants attempted to wield the trial court's exclusion of the Modic email against Dr. Di by arguing that his true value was $150,000, knowing that the ruling barred Dr. Di from introducing relevant evidence that his salary history was below market value. We cannot say that the trial court abused its discretion when it allowed the letter to be introduced to provide appropriate context in response to appellants' misleading tactic.

**{¶65}** Appellants' second assignment of error is overruled.

### III. The New Proximate Cause Opinion

**{¶66}** In their third assignment of error, appellants argue that the trial court erred in allowing Dr. Di's expert, Dr. Asseff, to introduce a new theory of causation not previously disclosed in his expert report or discovery deposition. Specifically, appellants argue that the trial court erred in allowing Dr. Asseff to testify that if Dr. Di did possess optic nerve damage, it was caused by trauma sustained during the cataract surgery. Appellants argue that they suffered unfair surprise due to this testimony and were

precluded from effectively cross-examining Dr. Asseff and introducing expert testimony to refute his position.

{¶67} It is unclear from the record why the parties failed to fully explore the question of optic nerve damage during discovery. Although Dr. Corrent was the only ophthalmologist who directly attributed Dr. Di's permanent vision loss to optic nerve damage, his opinion was known by both parties prior to trial. Furthermore, Dr. Corrent offered no opinion on the cause of the alleged optic nerve damage.

{¶68} Dr. Kosmorsky raised the theory of a congenital optic nerve abnormality as part of his differential diagnosis but admitted that neither amblyopia or an optic nerve abnormality was documented in Dr. Di's CCF records. Dr. Snyder repeatedly referred to Dr. Di's optic nerve as a "funny looking nerve" but testified that he performed an optic nerve coherence tomography on Dr. Di and did not find the nerve to be damaged. Dr. Snyder admitted that he did not disclose his opinion regarding Dr. Di's "funny looking" optic nerve at his deposition but conceded that he did not believe the nerve to be the ultimate limiting factor in Dr. Di's vision problems.

{¶69} Dr. Asseff testified that the medical records documented that Dr. Di sustained increased intraocular pressure as a result of the eye surgery and opined that, hypothetically, if Dr. Di's optic nerve was damaged, such damage was caused by the trauma of the surgery. There is no dispute that Dr. Asseff never opined, prior to trial, that Dr. Di suffered optic nerve damage as a result of the eye surgery.

{¶70} Civ.R. 26(E)(1)(b) requires a party to seasonably supplement responses to any questions directly addressed to the subject matter on which an expert is expected to

testify. "This duty * * * is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 370, 504 N.E.2d 44 (1986), *abrogated on other grounds, State v. D'Abrosio*, 67 Ohio St.3d 185, 1993-Ohio-170, 616 N.E.2d 909. The purpose of Civ.R. 26(E)(1)(b) is to prevent "trial by ambush." *Id*. at 371.

{¶71} Loc.R. 21.1(B), which governs the use of expert witnesses and expert reports in Cuyahoga County, further provides, in pertinent part:

> A party may not call an expert witness to testify unless a written report has been procured from the witness and provided to opposing counsel. It is counsel's responsibility to take reasonable measures, including the procurement of supplemental reports, to insure that each report adequately sets forth the expert's opinion. However, unless good cause is shown, all supplemental reports must be supplied no later than thirty (30) days prior to trial. The report of an expert must reflect his opinions as to each issue on which the expert will testify. An expert will not be permitted to testify or provide opinions on issues not raised in his report.

{¶72} The trial court has discretion to determine whether there has been a violation of Loc.R. 21.1 and how to remedy that violation. *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d 254, 257-258, 662 N.E.2d 1 (1996); *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph one of the syllabus. Thus, a reviewing court should not disturb a trial court's decision regarding a discovery sanction absent an abuse of discretion. *Nakoff* at syllabus; *Cox v. MetroHealth Med. Ctr. Bd. of Trustees*, 2012-Ohio-2383, 971 N.E.2d 1026, ¶ 41 (8th Dist.). The *Nakoff* court explained that, "[t]he discovery rules give the trial court great latitude in crafting sanctions to fit discovery abuses" and "[i]n order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the

exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff* at 256.

{¶73} An inquiry into whether a trial court abused its discretion in applying Loc.R. 21.1 is necessarily fact intensive. One purpose of Civ.R. 26(E)(1) is to prevent "trial by ambush." *Amerifirst Savs. Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 498, 737 N.E.2d 68 (2d Dist.1999); *Walker v. Holland*, 117 Ohio App.3d 775, 785-786, 691 N.E.2d 719 (2d Dist.1997); *Waste Mgt. of Ohio, Inc. v. Mid-America Tire, Inc.*, 113 Ohio App.3d 529, 681 N.E.2d 492 (2d Dist.1996). "If discovery is to serve its purpose, the parties must be entitled, upon the unveiling of a contention, to a reasonable opportunity to prepare to defend against it." *Waste Mgt.* at 533; *Shumaker* at 371.

{¶74} In *Cox*, this court found that a trial court had abused its discretion by allowing a defense expert to offer a new theory of causation based on new information that the expert learned after preparing his expert report and being deposed by the plaintiff. *Cox* at ¶ 37-48. The court held that, in the absence of a supplement to the expert's deposition testimony, the plaintiffs had a reasonable expectation that the defense expert's trial testimony would be consistent with his original responses provided in discovery. *Cox* at ¶ 43. We held that the plaintiffs in *Cox* were "surprised and prejudiced" by the expert's testimony. *Cox* at ¶ 43.

{¶75} In *O'Connor v. Cleveland Clinic Found.*, 161 Ohio App.3d 43, 2005-Ohio-2328, 829 N.E.2d 350, ¶ 25 (8th Dist.), this court found a party's failure to disclose a critical new theory by an expert witness to be a violation of Civ.R. 26(E) and Loc.R. 21.1. In *O'Connor*, we recognized the necessity of supplementing expert

testimony, stating that "the introduction of a new theory that has not been disclosed prior to trial 'smacks of ambush' and thwarts an opposing counsel's ability to effectively offer a counter theory or to cross-examine the expert." *Id*. at ¶ 20. We concluded that the trial court abused its discretion by allowing an expert witness to offer a new opinion on the possible cause of the injury, holding that "[t]he failure to disclose the new theory in either an expert report, as a supplement to [the doctor's] deposition, or by supplementing responses to original interrogatories distorted the level playing field." *Id*. at ¶ 23.

{¶76} The exclusion of otherwise reliable and probative evidence, however, is an extreme sanction for a discovery violation. *Cucciolillo v. E. Ohio Gas Co.*, 4 Ohio App.3d 36, 446 N.E.2d 175 (7th Dist.1980); *Mulford v. Columbus & S. Ohio Elec. Co.*, 4th Dist. Athens No. CA-1548, 1994 Ohio App. LEXIS 32 (Jan. 12, 1994). Thus, a court should exclude evidence only when clearly necessary to enforce willful noncompliance or to prevent unfair surprise. *See Nickey v. Brown*, 7 Ohio App.3d 32, 454 N.E.2d 177 (9th Dist.1982). In deciding whether to exclude evidence, "'the trial court should weigh the conduct of the party offering the expert testimony along with the level of prejudice that the opposing party suffered as a result of the discovery violation.'" *Culp v. Olukoga*, 4th Dist. Scioto No. 12CA3470, 2013-Ohio-5211, ¶ 38, quoting *Savage v. Correlated Health Serv.*, 64 Ohio St.3d 42, 591 N.E.2d 1216 (1992).

{¶77} In the present case, we find no abuse of discretion because we find no indication of surprise or prejudice on the record. The record reflects that appellants introduced the theory of a pre-existing congenital optic nerve abnormality in contradiction of the documentary evidence and the opinions of their own experts. Under these

circumstances, the trial court did not abuse its discretion in allowing Dr. Asseff, who attributed Dr. Di's injury to a completely separate proximate cause, to answer a hypothetical question regarding Dr. Di's optic nerve.

{¶78} Dr. Kosmorsky ingenuously raised the theory of a congenital optic nerve abnormality as part of his "differential diagnosis" despite admitting that neither amblyopia nor an optic nerve abnormality was documented in Dr. Di's CCF records. Furthermore, Dr. Kosmorsky's theory of a pre-existing congenital optic nerve condition was refuted by his own admission that two internal medicine physicians and an ophthamologist found Dr. Di's optic nerve to be normal prior to surgery. Kosmorsky conceded that Dr. Esposito himself performed a fundus examination on Dr. Di's optic nerve on December 10, 2010 and reported no abnormalities.

{¶79} Dr. Snyder's testimony in regards to Dr. Di's optic nerve was more evasive than Dr. Kosmorsky. Dr. Snyder repeatedly referred to Dr. Di's optic nerve as a "funny looking nerve." Dr Synder testified that he performed an optic nerve OCT on Dr. Di and did not find the nerve to be damaged. Dr. Snyder further admitted that he had no baseline view of Dr. Di's optic nerve as it existed prior to surgery for comparison. Despite this testimony, Dr. Synder concluded that Dr. Di's optic nerve possessed an "abnormal shape" from development in utero. Finally, and most importantly, Dr. Snyder opined that the surgery could not have caused damage to Dr. Di's optic nerve.

{¶80} Despite Dr. Snyder's opinion as to the "funny looking" nature of Dr. Di's optic nerve he testified that he did not believe the nerve to be the ultimate limiting factor in Dr. Di's vision problems. Dr. Snyder further admitted that he did not disclose his

opinion regarding Dr. Di's optic nerve at his deposition. He conceded that his report mentioned Dr. Di's optic nerve but, in contrast to his trial testimony, did not give an opinion on what caused it to look "funny."

{¶81} In response to this testimony, Dr. Asseff, who also concluded that Dr. Di's optic nerve was not the source of his vision problems, answered a hypothetical question that required him to assume that the nerve was, in fact, damaged. Although he found no such damage to Dr. Di's optic nerve, he testified that if the optic nerve was damaged, the damage was attributable to increased intraocular pressure from the trauma of the surgery.

{¶82} To conclude, both Dr. Asseff and Dr. Snyder held the opinion that Dr. Di's vision problems stemmed from the damage to his iris and pupil. Both experts were provided an opportunity to presume that Dr. Corrent's conflicting diagnosis of optic nerve damage was true and offer opinions on its cause. In other words, the only disagreement between the two experts on this issue was what could have caused this hypothetical injury that neither found Dr. Di to possess. Within that context both experts were allowed to offer an opinion regarding whether hypothetical optic nerve damage sustained by Dr. Di was attributable to the surgery.

{¶83} We find no element of "ambush" here. This case is similar to *Faulk v. Internatl. Business Machines*, 1st Dist. Hamilton Nos. C-765 and C-778, 2001 Ohio App. LEXIS 3980 (Sept. 7, 2001), where the court held that the trial court did not abuse its discretion by allowing a defense expert to testify regarding causation. The plaintiff argued that the trial court erroneously permitted the defense expert to testify regarding causation when his causation opinion given at trial differed from what he gave during his

deposition and when the defense did not inform the plaintiff of the change. The plaintiff asserted that the defense expert changed his theory of how the plaintiff suffered her injury. The appellate court disagreed, stating:

> [W]e must decide whether the subject matter of [the expert's] trial testimony materially differed from the subject matter of his deposition testimony. Throughout this litigation, [the expert] has opined that the surge protector was the cause of [the plaintiff's] injury. That opinion did not change. [The expert] has also consistently opined that the building was appropriately wired and grounded. What changed at trial was that [the expert] was presented with a hypothetical as to what effect an ungrounded electrical system would have had on his conclusion that the surge protector was the cause of [the plaintiff's] injuries. He opined that, in that situation, the ungrounding would have resulted in an electric shock to any device plugged into the defective surge protector, whenever a person touched a metal part of the device.
>
> This is not a case where an expert was unable to give an opinion on causation during his deposition, but did so at trial. *See Waste Management, of Ohio, Inc. v. Mid-America Tire, Inc.*, 113 Ohio App.3d 529, 533, 681 N.E.2d 492 (2d Dist.1996). Nor is it a situation where the expert specifically changed his or her opinion at trial. *See Fetters v. St. Francis/St. George Hospital, Inc.*, 1st Dist. Hamilton No. C-990410, 2000 Ohio App. LEXIS 999 (Mar. 17, 2000). This is also not a case where "the subject matter [of the expert's testimony] [was] revealed for the first time at trial and the opposing party had no reason to anticipate it." *See Fetters v. St. Francis/St. George Hospital, Inc*. In fact, the issue of the consequences of an ungrounded circuit was touched upon in [the expert's] deposition. Further, since it was obvious that the two expert's opinions were premised on whether the building's electrical system was grounded, we do not believe that [the expert's] opinion concerning the hypothetical was "an ambush."

*Id*.

{¶84} In this case, Dr. Asseff testified in his deposition that based on his testing, Dr. Di's optic nerve was normal. Dr. Asseff did not alter that opinion at trial. Dr. Asseff simply answered a hypothetical question posed that allowed him to assume certain facts were true — facts that neither Asseff nor Snyder found in their examinations of Dr.

Di.   Morever, both experts had the opportunity to offer what amounted to opinions on this hypothetical question.

{¶85} Appellants argue that because their expert, Dr. Snyder, testified out of order during Dr. Di's case-in-chief, he was prevented from effectively countering Dr. Asseff's purported new proximate cause theory.   But Dr. Snyder had addressed the exact issue during his redirect-examination that the clinic is now claiming it could not counter: Dr. Snyder opined that there was no way that the January 14, 2011 surgery could have caused Dr. Di's optic nerve abnormality.   Notably, it is quite possible that if Dr. Snyder had not first stated that Dr. Di's optic nerve abnormality could not have been caused by the January 14, 2011 surgery, then Dr. Asseff would not have responded with his counter opinion.   Again, this is because Dr. Asseff's ultimate opinion did not involve Dr. Di's optic nerve — and that did not change.   Further, even if Dr. Asseff had testified first, and then Dr. Snyder testified regarding his opinion, Dr. Di would have been able to recall Dr. Asseff to rebut Dr. Snyder's testimony.

{¶86} Thus, although Dr. Asseff testified that *if* Dr. Di had optic nerve damage, *then* it was caused by the January 14, 2011 surgery, his expert opinion that Dr. Di's vision problems were caused by the damage to his iris during the surgery — the ultimate issue in the case — remained unchanged.   Accordingly, we cannot say that the trial court abused its discretion.

{¶87} Although differences of opinions on this matter are possible, a mere disagreement with the trial court's decision does not show a "perversity of will" on the trial court's part necessary to find an abuse of discretion.   We cannot say that the trial

court's decision here was "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff*, 75 Ohio St.3d at 256, 662 N.E.2d 1. This was a complicated case that took place over a two-week period, involving specialized medical issues and the testimony of five competing experts. In the end, the jury simply believed Dr. Di's experts over the appellants' experts on the issue of whether Dr. Esposito deviated from the standard of care and whether that deviation was the proximate cause of Dr. Di's vision problems.

{¶88} Appellants' third assignment of error is overruled.

**IV. Defendant's Failure to Pass Board Certification Examinations**

{¶89} In their fourth assignment of error, appellants argue that the trial court erred in permitting Dr. Di's counsel to argue and cross-examine Dr. Esposito regarding his failure to pass his board certification examinations in the field of ophthalmology. We agree that the trial court erroneously permitted this testimony but find the error to be harmless.

{¶90} Dr. Di's counsel stated during opening statements that Dr. Esposito was inexperienced and had "failed his boards." He further questioned Dr. Esposito on the board certification exams and elicited an admission that Dr. Esposito had taken, and failed, the board exams twice.

{¶91} It is well established under Ohio law that questions regarding a defendant doctor's failure to pass board certification examinations is not relevant to the ultimate issue of whether the doctor breached the standard of care in a particular instance.

*O'Loughlin v. Mercy Hosp. Fairfield*, 1st Dist. Hamilton No. C-130484, 2015-Ohio-152, ¶ 9; *Shoemake v. Hay*, 12th Dist. Clermont No. CA2002-06-048, 2003-Ohio-2782, ¶ 13-15; *Keller v. Bacevice*, 9th Dist. Lorain No. 94CA005812, 1994 Ohio App. LEXIS 5444 (Nov. 30, 1994). This court has previously held that a trial court did not abuse its discretion in finding that questions about a doctor's failure to pass board certification examinations were not relevant to his competency or credibility. *Johnston v. Univ. Mednet*, 8th Dist. Cuyahoga No. 65623, 1994 Ohio App. LEXIS 3495 (Aug. 11, 1994), *overruled on other grounds*, 71 Ohio St.3d 608, 1995-Ohio-1, 645 N.E.2d 453.

**{¶92}** Although we find that the trial court erred in admitting the testimony regarding Dr. Esposito's failure to pass his board certification examinations, we find the error to be harmless. Absent a showing that a party's substantial rights were affected by the admission of evidence, we will disregard errors in the admission of evidence as harmless error. *See* Civ.R. 61. Litigants are not entitled to a perfect trial, only a fair one. *Spisak v. Salvation Army*, 8th Dist. Cuyahoga No. 99633, 2013-Ohio-5429, citing *Grundy v. Dhillon*, 120 Ohio St.3d 415, 2008-Ohio-6324, 900 N.E.2d 153. The erroneous admission of evidence "will not justify reversal of an otherwise valid adjudication where the error does not affect the substantial rights of the complaining party." *O'Brien v. Angley*, 63 Ohio St.2d 159, 407 N.E.2d 490 (1980); Civ.R. 61; R.C. 2309.59.

**{¶93}** Under Civ.R. 61, harmless error means:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a

verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

{¶94} In order to determine whether a substantial right has been affected, "'the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury * * * would probably have made the same decision.'" *Cox v. MetroHealth Med. Ctr. Bd. of Trustees*, 8th Dist. Cuyahoga No. 96848, 2012-Ohio-2383, 971 N.E.2d 1026, ¶ 23, quoting *O'Brien*, 63 Ohio St.2d at 165, 407 N.E.2d 490 (1980).

{¶95} As addressed in the above assignments of error, the record contains substantial evidence upon which the jury reasonably relied to conclude that Dr. Esposito violated the standard of care by attempting to repair Dr. Di's iris adhesion. This case turned upon which party's experts the jury believed regarding the standard of care, not upon Dr. Esposito's failure to pass his board certification examinations. The fact that Dr. Esposito failed his boards was wholly irrelevant to the standard of care question presented in this case — whether Dr. Esposito erred in deciding to engage in an unnecessary and risky surgical course based on the conditions presented by Dr. Di's eye before surgery. The ultimate question presented was simple: was Dr. Esposito's surgical course of action a breach of the standard of care? His failure to pass the board examinations had no bearing on this issue. Thus, because we find no evidence of

prejudice in this instance, we find the trial court's admission of this testimony to be harmless error.

**{¶96}** Appellants' fourth assignment of error is overruled.

**V. Dr. Di's Contributory and Comparative Negligence**

**{¶97}** In their fifth assignment of error, appellants argue that the trial court erred in failing to instruct the jury on Dr. Di's contributory or comparative negligence in this case.

**{¶98}** Requested jury instructions should ordinarily be given if they are correct statements of law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the specific instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991). In Ohio, it is well established that the trial court will not instruct the jury where there is no evidence to support an issue. *Riley v. Cincinnati*, 46 Ohio St.2d 287, 348 N.E.2d 135 (1976), paragraph two of the syllabus. When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *Harris v. Noveon*, *Inc.*, 8th Dist. Cuyahoga No. 93122, 2010-Ohio-674, ¶ 20.

**{¶99}** R.C. 2315.33 provides:

> The contributory fault of a person does not bar the person as plaintiff from recovering damages that have directly and proximately resulted from the tortuous conduct of one or more other persons, if the contributory fault of the plaintiff was not greater than the combined tortuous conduct of all other persons from whom the plaintiff seeks recovery in this action and of all other persons from whom the plaintiff does not seek recovery in this action. The court shall diminish any compensatory damages recoverable by the plaintiff by an amount that is proportionately equal to the percentage of

tortuous conduct of the plaintiff as determined pursuant to section 2315.34 of the Revised Code.

R.C. 2315.33.

{¶100} "Ohio law recognizes the defense of contributory negligence in medical malpractice cases * * * [and] such negligence can serve to diminish recovery under modern comparative negligence principles * * *." *Faber v. Syed*, 8th Dist. Cuyahoga No. 65359, 1994 Ohio App. LEXIS 2976, *22 (July 7, 1994) quoting *Lambert v. Shearer*, 84 Ohio App.3d 266, 284, 616 N.E.2d 965 (10th Dist. 1992).

> "To prove the affirmative defense of contributory negligence, the defendant must prove that the plaintiff breached a duty, proximately causing his or her own injury. Thus, the plaintiff's own 'want of ordinary care * * * [must have] combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred.'"

*Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, 915 N.E.2d 361, ¶ 61, (9th Dist.) quoting *Brinkmoeller v. Wilson*, 41 Ohio St.2d 223, 226, 325 N.E.2d 233 (9th Dist. 1975).

{¶101} Appellants' sole argument to support such an instruction is that Dr. Di was contributory or comparatively negligent in selecting and relying upon Dr. Esposito to perform his eye surgery. None of the authority cited by appellants support the proposition that a patient's actions in selecting a doctor held out to be qualified to perform a surgery can amount to contributory or comparative negligence nor is this court aware of any such authority.

{¶102} Appellants' fifth assignment of error is overruled.

**VI. Plaintiff Counsel's Inflammatory Remarks**

{¶103} In their sixth assignment of error, appellants argue that improper and inflammatory comments made by Dr. Di's trial counsel during trial constituted attorney misconduct that prejudicially influenced the outcome of the jury's verdict.

{¶104} As a general rule, "it is axiomatic that great latitude is afforded counsel in the presentation of closing argument to the jury." *Pang v. Minch*, 53 Ohio St.3d 186, 194, 559 N.E.2d 1313 (1990). Counsel is allowed wide latitude in presenting oral argument although at all times counsel is subject to the supervision of the trial judge. *Yerrick v. E. Ohio Gas Co.*, 119 Ohio App. 220, 223, 198 N.E.2d 472 (9th Dist.1964).

{¶105} "[T]he determination of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court. Therefore, the trial court's determination will not be reversed absent an abuse of discretion." *Caruso v. Leneghan*, 8th Dist. Cuyahoga No. 99582, 2014-Ohio-1824, ¶ 57, quoting *Pesek v. Univ. Neurologists Assn.*, 87 Ohio St.3d 501, 2000-Ohio-483, 721 N.E.2d 1011. However, that discretion is not absolute. Where "gross and abusive conduct occurs, the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct." *Id.* citing *Snyder v. Stanford*, 15 Ohio St.2d 31, 37, 238 N.E.2d 563 (1968).

{¶106} We note that appellants failed to object to any of the statements made in closing argument with which they now take issue. A party must generally raise a timely objection to preserve a claim of error. *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 39-40, 543 N.E.2d 464 (1989). Pursuant to *Snyder v. Stanford*, 15 Ohio St.2d 31, 238

N.E.2d 563 (1968), this failure prevents reversal absent gross and persistent abuse of counsel's privilege in closing argument.

{¶107} We find no such abuse in this instance. While some of the remarks made by plaintiff's counsel during closing argument may have arguably been inflammatory, we cannot say that they were so outrageous as to call into doubt whether the verdict was rendered upon the evidence and thus warrant a new trial. Again, there was sufficient evidence to support the jury's verdict. We note that plaintiffs' counsel's reference to Dr. Modic's email to which appellants now complain would never have occurred but for appellants' own strategic miscalculation in attempting to manipulate the trial court's initial exclusion of the letter to their benefit as addressed in the second assignment of error.

{¶108} Many of the other statements that appellants now challenge represent legitimate argument regarding the credibility of various witnesses based on evidence introduced at trial. "A [party] may freely comment in closing argument on what the evidence has shown and what reasonable inferences the [party] believes may be drawn therefrom." *Peffer v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 94356, 2011-Ohio-450, ¶ 27, citing *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 47 (8th Dist.).

{¶109} Finally, opening and closing statements are not evidence. *Peffer* at ¶ 27. The trial judge in this instance instructed the jury as such and the jury is presumed to follow the proper instructions of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27,

2004-Ohio-4190, 813 N.E.2d 637; *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032.

{¶110} Appellants' sixth assignment of error is overruled.

**VII. Appellants' Motion for a New Trial**

{¶111} Appellants argue in their seventh assignment of error that the trial court erred in denying their motion for a new trial.   Appellants begin by arguing that a new trial should have been granted due to the perceived errors addressed above in the first six assignments including the "cumulative effect" of such errors.   Having found no merit to those arguments, we decline to revisit them here.

{¶112} Appellants present us with two new arguments: (1) that the jury's verdict was against the manifest weight of the evidence, and (2) that the jury rendered an excessive verdict under the influence of passion and prejudice.   Civ.R. 59(A)(6) and (4), respectively, allow for a new trial to be granted on these grounds.

{¶113}   A trial court's judgment on a Civ.R. 59 motion for a new trial is reviewed under the abuse of discretion standard. *May v. Marc Glassman, Inc.*, 8th Dist. Cuyahoga No. 93966, 2011-Ohio-1581, ¶12, citing *Effingham v. XP3 Corp.*, 11th Dist. Portage No. 2006-P-0083, 2007-Ohio-7135. The decision to grant a motion for a new trial rests within the sound discretion of the trial court and will not be disturbed upon appeal unless there has been an abuse of that discretion. *Id.*, citing *Pena v. N.E. Ohio Emergency Affiliates, Inc.*, 108 Ohio App.3d 96, 104, 670 N.E.2d 268 (9th Dist. 1995).

{¶114} When reviewing the manifest weight of the evidence in a civil case, this court weighs the evidence and all reasonable inferences, considers the credibility of

witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. Weight of the evidence concerns "'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio- 52, 678 N.E.2d 541, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶115} We are guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). This presumption arises because the trier of fact had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*

{¶116} With regard to appellants' first argument, we cannot say that the verdict was against the manifest weight of the evidence. The jury had the opportunity to assess the credibility of the various experts and weigh their testimony in conjunction with the documentary evidence. We cannot say the jury lost its way in finding Dr. Di's experts, their testimony regarding the relevant standard of care and their explanation of his injury to be more credible than that of appellants' experts. Appellants' experts offered a comparatively less believable explanation of the relevant events: that Dr. Di's various maladies including the photophobia, glare and ghost images were attributable to his original injury caused by the bone fragment rather than the iris reconstruction procedure. Appellants' experts' theory that Dr. Di's cataract masked these symptoms until it was

removed during the eye surgery was inconsistent with Dr. Di's testimony describing a gradual decrease in his vision, the relevant and documented time line of his pursuit of treatment between the two events and his continued practice as a neurosurgeon after the initial injury. We cannot say that the weight of the evidence supported appellants' position.

{¶117} Finally, appellants argue that the jury returned an excessive verdict that "appears to have been given under the influence of passion and prejudice."

{¶118} "[T]he assessment of damages lies 'so thoroughly within the province of the [trier of fact] that a reviewing court is not at liberty to disturb the [trier of fact's] assessment' absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive or inadequate." *Pesic v. Pezo*, 8th Dist. Cuyahoga No. 90855, 2008-Ohio-5738, at ¶ 21, quoting *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655, 635 N.E.2d 331 (1994).

{¶119} To determine whether a verdict was influenced by passion or prejudice, the court should consider the amount of damages returned and whether the record discloses that the verdict was induced by: "(a) admission of incompetent evidence, (b) misconduct on the part of the court or counsel, or (c) by any other action occurring during the course of the trial which can reasonably be said to have swayed the jury in their determination of the amount of damages that should be awarded." *Fromson & Davis Co. v. Reider*, 127 Ohio St. 564, 569, 189 N.E. 851 (1934); *Banas v. Shively*, 8th Dist. Cuyahoga No. 96226, 2011-Ohio-5257, ¶ 44.

{¶120} The size of the verdict alone is insufficient to demonstrate passion or prejudice. *Rinehart v. Brown,* 4th Dist. Ross No. 05CA2854, 2006-Ohio-1912, ¶ 16, citing *Airborne Express, Inc. v. Sys. Research Laboratories, Inc.*, 106 Ohio App.3d 498, 510, 666 N.E.2d 584 (12th Dist. 1995). "'[T]here must be something contained in the record which the complaining party can point to that wrongfully inflamed the sensibilities of the [factfinder].'" *Pesic* at ¶ 23, citing *Shoemaker v. Crawford*, 78 Ohio App.3d 53, 65, 603 N.E.2d 1114 (10th Dist. 1991).

{¶121} We find no evidence that the verdict in this case was the result of passion or prejudice. Even if we found evidence in the record that the jury was "wrongfully inflamed," we find no merit to any of the arguments presented by appellants taking issue with individual aspects of the jury's reward. Contrary to appellants' arguments, the evidence at trial revealed that Dr. Di was permanently deprived of useful vision in his left eye resulting in a loss of depth perception and the effective end of his career as a neurosurgeon. The testimony further documented appellees' noneconomic losses including pain and suffering and loss of consortium. Appellants argue that the jury's award of $500,000 to Nan Qiao for loss of consortium was "excessive," however, Nan Qiao testified in great detail to the devastating effects Dr. Di's injury had upon their family relationships and dynamics.

{¶122} Finally, we find no merit to appellants' contention that Dr. Di failed to prove future wage loss. Contrary to appellants' assertions, the testimony revealed that Dr. Di was fully capable of finding employment as a neurosurgeon and aborted a process of seeking an appeal to practice in Missouri due to his vision loss. Contrary to

appellants' allegations of a jury verdict inflamed by passion and prejudice, we note that the jury's cumulative lost wages award of $4,200,000 was less than the *least favorable* economic loss projection offered by Dr. Di's economics expert.

{¶123} Even if appellants' argument that Dr. Di would be unable to practice in Missouri were to be accepted, we find no merit to the broader argument that after years of successful practice at the CCF he instantaneously became unemployable upon his departure from the CCF solely due to his inability to obtain board certification. The record reflects that Dr. Di possessed a unique and sought after skill set as a neurosurgeon. Indeed, Dr. Di testified that he was able to find the position in Missouri in less than a month after it became clear he would no longer be employed with the CCF. He also testified that it was not the only job available for a neurosurgeon who was non-board certified.

{¶124} After reviewing the record, we do not find the trial court abused its discretion in denying a new trial on the ground that the jury awarded an excessive verdict given under the influence of passion or prejudice.

{¶125} Appellants' seventh assignment of error is overruled.

**VIII. Application of Ohio's Statutory Caps on Noneconomic Damages**

{¶126} In appellants' eighth and final assignment of error they argue that the trial court erred in failing to properly apply Ohio's statutory cap on non-economic damages.

{¶127} The jury's award of damages for Dr. Di in this case was set forth in interrogatory No. 13 as follows:

Past Economic Loss (Lost Wages):                                 $ 1.2 mil

| Past Noneconomic Loss (Pain and Suffering): | $ 1 mil |
| Future Economic Loss (Wages): | $ 3 mil |
| Future Noneconomic Loss (Pain and Suffering): | $ 0 |
| Permanent Disability: | $ 2 mil |
| Total: | $ 7.2 mil |

{¶128} Citing R.C. 2323.43(A)(3)(a), the trial court reduced the $1,000,000 award for Dr. Di's "Past Noneconomic loss (Pain and Suffering)" to the statutory cap of $500,000. Appellants sought for the judgment to be further reduced by $2,000,000 arguing that the award for "Permanent Disability" constituted noneconomic damages in excess of the statutory cap. The trial court refused.

{¶129} Under Ohio law, a tort plaintiff may recover unlimited compensatory damages for noneconomic losses if the plaintiff has sustained either "permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system," or "permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities." R.C. 2315.18(B)(3); *Simpkins v. Grace Brethren Church of Del.*, 2014-Ohio-3465, 16 N.E.3d 687, ¶ 77 (5th Dist.).

{¶130} However, R.C. 2323.43 provides more stringent limitations upon noneconomic damages in actions based on medical claims. R.C. 2323.43(A) provides in relevant part:

(1) There shall not be any limitation on compensatory damages that represent the economic loss of the person who is awarded the damages in the civil action.

(2)  Except as otherwise provided in division (A)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a civil action under this section to recover damages for injury, death, or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the plaintiff's economic loss, as determined by the trier of fact, to a maximum of three hundred fifty thousand dollars for each plaintiff or a maximum of five hundred thousand dollars for each occurrence.

(3)  *The amount recoverable for noneconomic loss* in a civil action under this section *may exceed the amount described in division (A)(2) of this section but shall not exceed five hundred thousand dollars for each plaintiff* or one million dollars for each occurrence *if the noneconomic losses of the plaintiff are for either of the following:*

> (a)  *Permanent and substantial physical deformity*, loss of use of a limb, or loss of a bodily organ system;

> (b)  Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities.

(Emphasis added.) R.C. 2323.43(A)

{¶131} In interrogatory No. 14 the jury found that Dr. Di's eye injury constituted a permanent and substantial physical deformity.   The dispute in this instance is whether the jury's award of $2,000,000 for Dr. Di's "Permanent Disability" constitutes economic or noneconomic damages.

{¶132} R.C. 2323.43(H) defines economic and noneconomic loss as follows:

(1)  "Economic loss" means any of the following types of pecuniary harm:

> (a)  All wages, salaries, or other compensation lost as a result of an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim;

> (b)  All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations as a result of an injury, death, or loss to person or

property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim;

(c)   Any other expenditures incurred as a result of an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim, other than attorney's fees incurred in connection with that action.

* * *

(3)   "Noneconomic loss" means nonpecuniary harm that results from an injury * * * including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss.

R.C. 2323.43(H).

{¶133} Appellants argue that Dr. Di's "Permanent Disability" award constituted noneconomic damages for disfigurement in the form of a permanent and substantial physical deformity. Dr. Di argues that the jury's award for "Permanent Disability" compensated him for economic harm in the form of lost earning potential beyond merely wages, lost net worth, lost returns on investments and future expenses. Dr. Di further argues that by failing to object to the ambiguous jury interrogatory providing for "Permanent Disability" or the jury's verdict, appellants have waived the right to challenge the trial court's application of R.C. 2323.43(A). Dr. Di further argues that this assignment of error should be overruled because appellants cannot prove that the permanent disability award was purely noneconomic.

{¶134} We find one fatal flaw in all three of Dr. Di's arguments: The "Permanent Disability" interrogatory was plainly unambiguous within the context of this case and, considering that context, the only possible interpretation is that it constituted

noneconomic damages. We reach this conclusion because Dr. Di presented no evidence of economic damages, past or future, other than lost wages. Consistent with this, in Dr. Di's closing argument he specifically limited his request for economic damages to lost wages while requesting noneconomic damages for his pain, suffering, and permanent and substantial physical deformity of his left eye. Dr. Di's trial attorney detailed to the jury the damages he sought as follows:

> Our damages are noneconomic and economic.
>
> What are noneconomic damages? Dr Di's pain, suffering, and permanent and substantial physical deformity of his left eye; Nan's loss of consortium and the destruction of the family unit.
>
> * * *
>
> * * * [W]hat are the economic damages? If you take his prior salary of 300 grand, it's going to range from five to $6 million in future lost earning capacity. If you take the average compensation— remember Dr. Modic said 475— the range is 7 to $9 million.
>
> * * *
>
> So the damages in this case, I'm asking for $1 million for Dr. Di for noneconomic damages and $1 million for Nan. Lost earning capacity, there's a range. You can give him the $300,000 one, which is $5 million. Or, you can give him the full fare that Dr. Modic said he should have gotten, which is $9 million. So I believe a full and fair verdict in this case is anywhere between seven to $11 million, depending on which economic analysis you accept.

{¶135} None of the purported economic damages that Dr. Di now asserts that the $2,000,000 permanent disability award represents were sought at trial or supported by any evidence. Indeed, if we were to accept Dr. Di's argument that the permanent disability award secretly represented unintroduced, unproven and unsought economic damages, our analysis of the jury's award under appellants' manifest weight challenge would be altered

to address this discrepancy.   Considering the subject interrogatory within the appropriate context, we find no ambiguity in the permanent disability award's nature as noneconomic damages and find that the trial court erred in failing to reduce the award pursuant to R.C. 2323.43(A)(3)(a).

{¶136} Appellants' eighth assignment of error is sustained.

**IX. Appellees' Cross-Assignment of Error**

{¶137} Appellees argue in their cross-assignment of error that if this court orders a new trial on the medical negligence claim against Dr. Esposito, then we should also order a new trial on the claims for which the jury returned a defense verdict.   We find this assignment of error to be moot.

**X. Conclusion**

{¶138} The judgment of the trial court is affirmed in part, reversed in part and remanded.

It is ordered that appellants and appellees share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and

PATRICIA ANN BLACKMON, J., CONCUR