[Cite as *Estate of Crnjak v. Lake Hosp. Sys. Inc.*, 2024-Ohio-1977.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

THE ESTATE OF ROSE CRNJAK,
DECEASED, BY LEE CRNJAK, :

      Plaintiff-Appellee, :

                                 No. 113027

      v. :

LAKE HOSPITAL SYSTEM, INC.,
ET AL., :

      Defendant-Appellant. :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 23, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-20-932285

---

### *Appearances:*

Spangenberg, Shibley & Liber, Nicholas A. DiCello, and
Dustin B. Herman, *for appellee.*

Hanna, Campbell & Powell, LLP, Beverly A. Sandacz, W.
Bradford Longbrake, and Carol Tran, *for appellant.*

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Lake Hospital System, Inc. ("Lake Hospital") appeals from the trial court's order denying their motion for summary judgment, from the trial court's order denying their motions for directed verdict and for

judgment notwithstanding the verdict, and from the jury verdict against them and in favor of plaintiff-appellee, the Estate of Rose Crnjak, deceased, by Lee Crnjak. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} This appeal stems from a wrongful death action.

{¶ 3} In November 2018, Rose Crnjak ("Rose") was a 68-year-old woman living alone in Eastlake, Ohio. On the night of Saturday, November 10, 2018, Rose called her primary care doctor, Dr. Winston Ho ("Dr. Ho") complaining of a possible urinary tract infection ("UTI"), left flank pain, and a fever. Dr. Ho instructed Rose to go to the hospital, and Rose went to the Lake West Emergency Department ("Lake West" or "the ER") in Willoughby, Ohio. Rose was admitted to the ER at 7:33 p.m. on Saturday, November 10, 2018. While there, Rose submitted a urine sample and a blood draw was ordered. Rose was diagnosed with a UTI and sent home with a prescription for oral antibiotics and instructions to follow up with Dr. Ho. Rose was discharged at 2:59 a.m. on Sunday, November 11, 2018.

{¶ 4} Nine hours later, on Sunday afternoon, hospital staff at Lake West received the results of Rose's blood test and learned that Rose had a blood infection and that she had had a blood infection since at least 8 p.m. the night before, on Saturday night. No one contacted Rose to inform her that she had a blood infection or otherwise instruct her. Four days later, Rose was discovered dead in her bed at home, having died from sepsis as a result of her blood infection.

{¶ 5} On May 1, 2020, Lee Crnjak ("Crnjak"), as administrator of the Estate of Rose, Deceased ("the estate"), filed a complaint against Lake Hospital, Larry E. Myles, M.D. ("Dr. Myles"), Randall Adolph, D.O. ("Dr. Adolph"), Kelly R. Tisch, PA-C ("PA Tisch"), Emergency Medicine Physicians, LLC ("EMP"), Erieside Medical Group, Inc. ("Erieside"), and Dr. Ho.[1]

## I. Motion for Summary Judgment

{¶ 6} On December 14, 2020, after litigating the case for approximately seven months, codefendants Erieside and Dr. Ho filed a motion for summary judgment, arguing that the action was a legal nullity because the estate was closed at the time Crnjak filed his complaint on May 1, 2020. Therefore, according to Erieside and Dr. Ho, Crnjak lacked the requisite standing necessary to initiate the suit against them. They further argued that Crnjak had the opportunity to correct this defect by reopening the estate prior to the expiration of the statute of limitations on November 15, 2020,[2] but failed to do so.

{¶ 7} On December 17, 2020, codefendants Dr. Myles, Dr. Adolph, PA Tisch, and EMP filed a motion to join Erieside and Dr. Ho's motion for summary judgment.

{¶ 8} On January 11, 2021, Crnjak filed a brief in opposition to defendants' motion for summary judgment. Crnjak's counsel argued that at the time the case

---

[1] Pursuant to the initial complaint, venue was appropriate in Cuyahoga County because Dr. Ho is a resident of Cuyahoga County.

[2] Rose's death certificate lists her date of death as November 15, 2018. Pursuant to R.C. 2125.01, et seq., Ohio's wrongful death statute, the statute of limitations for a wrongful death action is two years from the date of the decedent's death. Therefore, the statute of limitations expired on November 15, 2020.

was filed, Crnjak mistakenly thought that he remained the administrator of his mother's estate; counsel took responsibility as Crnjak's attorneys for not catching this before the complaint was filed. Crnjak further stated that the appropriate documents had been filed in the Lake County Probate Court, and as soon as possible, he would move to amend the complaint. The amended complaint, according to Crnjak, would then relate back to the filing of the original complaint, such that the statute of limitations would not bar the action.

{¶ 9} Over a month after the motion for summary judgment was filed, on January 25, 2021, Lake Hospital moved to join codefendants' motion for summary judgment. On February 9, 2021, the trial court granted both motions to join.

{¶ 10} On October 12, 2021, the trial court denied the motion for summary judgment and granted Crnjak's motion for leave to file an amended complaint. In a corresponding journal entry, the court stated:

> The court further finds that the first amended complaint relates back to the initial complaint because it relates to the right of action and does not affect the substantive cause of action. See Civil Rule 15(C); *Douglas v. Daniels Bros. Coal Co.*, 135 Ohio St. 641, 22 N.E.2d 195 (1939); *Eichenberger v. Woodlands Assisted Living Residence, LLC*, 2014-Ohio-5354, 25 N.E.3d 355 (10th Dist.); *Stone v. Phillips*, 9th Dist. Summit No. 15908, 1993 Ohio App. LEXIS 3989, *8-9 (Aug. 11, 1993); *Sidoti v. Pelczarski*, 8th Dis. Cuyahoga No. 55020, 1988 WL 86243. Although the court agrees with the Tenth District's conclusion that a pleader's good or bad faith is not determinative in application of the "relation-back" doctrine, the court finds that plaintiff did not knowingly misrepresent his authority. *See Eichenberger* at ¶ 36. Further, the court finds that applying the doctrine in this case is just and equitable and does not violate the principles of the applicable statutes of limitations.

Because plaintiff's first amended complaint relates back to the filing date of the complaint, plaintiff's claims are not barred by R.C. 2125.02 or R.C. 2305.113. The court therefore finds defendants' first motion for summary judgment is not well-taken.

## II. Trial

{¶ 11} On February 1, 2023, due to the unavailability of the original judge in this matter, the case was reassigned to a visiting judge. On February 9, 2023, a jury was empaneled, and trial began. Testimony pertinent to our analysis follows.

## A. Dr. Ho

{¶ 12} Dr. Ho testified at trial that he had been Rose's doctor for 17 years. He testified that Rose had been diagnosed with a kidney infection in September 2018 and was treated for that. With respect to the days leading up to Rose's death, Dr. Ho testified that Rose left a message for him around 6:30 p.m. on the evening of Saturday, November 10, 2018, complaining of a possible UTI, left flank pain, and fever. Dr. Ho called Rose around 7 p.m. Dr. Ho testified that he did not specifically remember this phone call with Rose, but he confirmed that if she had called him reporting that pain came on suddenly in the middle of the night several days earlier, that she was nauseous, and that she had been vomiting, that would be why Dr. Ho would have advised Rose to go to the emergency room at Lake West.

{¶ 13} Dr. Ho testified that he received a phone call from the ER around 2 a.m. on Sunday, November 11, 2018. Dr. Ho spoke to PA Tisch, but he did not remember this phone call. The only notes from this phone call were the notes that PA Tisch made in Rose's medical records at 1:51 p.m. on Sunday, approximately 12

hours after the phone call. PA Tisch's notes stated that Dr. Ho denied that Rose had any further need to be admitted and that Dr. Ho would repeat blood work on Monday or Tuesday. The notes also stated that Dr. Ho agreed that a CT scan was not necessary before Rose left the ER. At trial, Dr. Ho disagreed with these notes, testifying that he did not even have the ability to do blood work in his office and that he would never tell ER personnel what to do because it was their job to evaluate and treat the patient. Dr. Ho also testified that he did not tell ER personnel which antibiotic to prescribe to Rose. Dr. Ho testified that he had no access to Rose's records from the ER. Dr. Ho testified that he received a fax with Rose's urine culture results, but he denied that he was ever notified that Rose had a blood infection. He further testified that had he received any notification that Rose had a blood infection, he would have called her.

## B. ER Personnel

{¶ 14} Dr. Adolph, Dr. Myles, and PA Tisch all testified at trial about their treatment of Rose in the ER on November 10 and 11. All three testified that they did not remember Rose or their treatment of her, so their testimony was based on their respective standard practice and what was documented in the medical records.

{¶ 15} PA Tisch testified that she is a physician assistant, and in November 2018, she worked in the ER at Lake West. She testified that she began practicing as a licensed physician assistant in October 2017. PA Tisch testified that she was currently employed at the Cleveland Clinic in the anesthesia department, and her

employment at Lake West ended in November 2018, not long after the events underlying this case.

{¶ 16} PA Tisch testified that on Saturday, November 10, 2018, she started work in the ER at 5 p.m. and was under the supervision of Dr. Adolph until 10 p.m. At that time, a shift change took place, and PA Tisch was under the supervision of Dr. Myles until her shift ended at 1 a.m. on Sunday, November 11, 2018.

{¶ 17} With respect to Rose's diagnosis and treatment in the ER, PA Tisch testified that Rose presented with a possible kidney infection and reported having had a kidney infection several months prior, in September. PA Tisch testified that based on this, there was a concern of recurrent pyelonephritis — recurrent kidney infections — and patients with recurrent pyelonephritis should be sent for imaging, such as CT scans or ultrasounds, to determine if they have kidney stones.

{¶ 18} The results of Rose's urinalysis came back positive for bacteria and blood, and at 9:15 p.m. she began receiving intravenous ("IV") medication: Toradol for her pain and Zofran to help her nausea and vomiting. At 10:41 p.m., Rose was given Tylenol for her fever and began receiving IV antibiotics.

{¶ 19} PA Tisch testified that she does not remember who called Dr. Ho, but Dr. Ho was called around 2 a.m. on Sunday. PA Tisch documented notes from the call in Rose's medical records approximately 12 hours after the call took place. PA Tisch's note said that Rose was "not fully evaluated for pyelonephritis," but when asked if she knew that Rose had pyelonephritis, PA Tisch testified that "[w]e had a

high suspicion that the infection was in the kidney, yes," and that Rose was treated accordingly. Tr. 771.

{¶ 20} PA Tisch's note also stated that Rose's outpatient prescription was for 750 milligrams of Levofloxacin, an oral antibiotic. PA Tisch testified that Dr. Ho made the decision on what medication to prescribe for Rose, contrary to Dr. Ho's testimony. The note also stated that "we cannot fully evaluate for resolution of sepsis." Tr. 788. PA Tisch testified that some of Rose's symptoms, such as a fever and high heart rate, triggered the ER's sepsis protocol, prompting the ER to order a sepsis panel, which included blood tests, a chest x-ray, and an EKG.

{¶ 21} PA Tisch testified that when Rose left the ER, she had diagnosed Rose with a UTI, and Dr. Myles had diagnosed Rose with a UTI with flank pain. PA Tisch testified that Rose had an improved status and was stable at the time of her discharge.

{¶ 22} Dr. Myles testified that he was an ER doctor who worked as a "firefighter," meaning that he would travel to work shifts in different emergency departments as needed. Dr. Myles primarily worked throughout Ohio, including at Lake West. In November 2018, he was employed by a medical staffing agency, US Acute Care Solutions ("USACS"), although at that time, he had notified USACS that he had secured a different job. His shift at Lake West on November 10, 2018, was his last shift at that hospital. Dr. Myles testified that he began that shift around 10 p.m. and was supervising PA Tisch; he did not communicate directly with Dr.

Adolph at the end of his shift. For the first several hours that Rose was in the ER, PA Tisch was the one primarily treating Rose.

{¶ 23} Dr. Myles accessed Rose's medical records for the first time at 12:58 a.m., and at 1:02 a.m., PA Tisch ordered a sepsis panel for Rose based on her triggering the sepsis protocol five hours earlier. The sepsis panel meant that shortly after 1 a.m., Rose got an EKG, a chest x-ray, and blood tests.

{¶ 24} Shortly after 2 a.m., Dr. Myles entered a note in Rose's chart. Around 2:30 p.m., Dr. Myles and PA Tisch made the decision to discharge Rose.

{¶ 25} Dr. Myles diagnosed Rose with pyelonephritis, a kidney infection. Dr. Myles testified that based on the information he had at the time of Rose's discharge, he thought that either admitting Rose to the hospital or discharging her were reasonable options, "as long as we could establish a plan with close follow-up." Tr. 1072. Dr. Myles testified that as part of the plan for Rose's discharge, she was prescribed an oral antibiotic; according to Dr. Myles, this decision was made by Dr. Ho, PA Tisch, and himself in collaboration. Rose's discharge notes indicated a concern for urosepsis, or sepsis in the urinary system.

{¶ 26} He testified that the results of the blood cultures, which came back after his shift ended, showed that Rose had a blood infection at the time she showed up at the ER. Dr. Myles further testified that "Rose should have been made informed" that she had a blood infection and that she "should have been made aware and advised to come back to the hospital." Tr. 1062, 1064.

{¶ 27} Dr. Adolph testified that he was an emergency medicine doctor and in 2018, he was also working for USACS. At the time, he was living in South Carolina and, like Dr. Myles, was working as a "firefighter," meaning he travelled around the country to work shifts at different emergency departments. Dr. Adolph testified that on Saturday, November 10, 2018, his shift at Lake West was from 2 p.m. until 10 p.m.; he was the attending physician in the ER when Rose arrived at the ER.

{¶ 28} Dr. Adolph testified that Rose was initially seen by triage and screened for a UTI. At no point during Dr. Adolph's shift on November 10 did he personally examine Rose. Dr. Adolph's next shift began at 6 a.m. on Sunday, November 11, 2018. At 11:53 a.m. on Sunday, Rose's blood test lab results came back showing that she had a blood infection. Dr. Adolph testified that because Rose had been discharged with antibiotics and a plan to follow up with Dr. Ho, it would have been unreasonable for him to call Rose and tell her she had a blood infection. Dr. Adolph went on to testify that "[s]omebody would have told Rose" she had a blood infection. Tr. 1160. When asked whose job it was to tell Rose she had a blood infection, Dr. Adolph testified "[i]t would have been my job to decide if she needed to be told at that moment, and I did not think that she needed to be told at that precise moment when we had a plan in place." Tr. 1163. Dr. Adolph further testified that he believed that Dr. Ho would "eventually" receive the results of Rose's blood test. Tr. 1178.

{¶ 29} Megan Allen ("Allen") testified that she was employed as a registered nurse ("RN") in the ER when Rose was discharged on November 11, 2018. Allen testified that she has been an RN since 2013, and at the time of the incident in this

case, she was working as charge nurse in the emergency department, where she would oversee the flow of the department and help facilitate admissions or discharges. Allen testified that the ER used Veriphy, an alert and communications system that allows the lab to communicate directly with the ER about critical lab results.

{¶ 30} On cross-examination, Allen testified as to the Veriphy message log relevant to Rose's blood test results showing an infection alert in this case. Specifically, Allen testified that someone input a message into Veriphy at 11:57 a.m. on Sunday, November 11, 2018, showing that Rose had a critical blood infection. Allen testified that this message — a critical red alert, signifying a need for immediate action — would be sent to several places, including the pager she carried as charge nurse, and the fax machine at the ER's secretary's desk. Allen testified that the system was set up so that if no one responded to the alert, it would go out again ten minutes later. In this case, Allen confirmed that the alert went out multiple times before it elicited a response. At 12:27 p.m., the alert was sent to the Lake West lab coordinator, as well as the coordinator at a different hospital about 20 miles from the ER, because the alert had not been responded to yet. Allen testified that she created a message in Veriphy stating that she was aware and was forwarding to the culture nurse.

{¶ 31} Allen testified that as an RN, she was not able to interpret the Veriphy message about lab results and would typically gather the relevant information and review the patient's chart before passing the information on to the doctor. In this

case, Allen accessed Rose's medical records at 1:10 p.m. on Sunday, had a conversation with Dr. Adolph, and then wrote a note in Rose's records that the critical red alert for gram negative bacteria[3] was "cleared," or addressed, and that the antibiotics that Rose had been prescribed were correct for a blood infection according to Dr. Adolph. Tr. 714. Dr. Adolph later testified that Allen's note that the red alert was "cleared" was "very unclear" and he did not know what Allen meant. Tr. 1172.

{¶ 32} Allen further testified that when she worked in the ER, there was a position of "culture nurse" who worked Monday through Friday. The week of the incident in this case, the culture nurse did not make a note in Rose's file until Tuesday, November 13, 2018. Allen testified that on weekends, she would "stand in the shoes" of the culture nurse. In this role, Allen would give the doctors information from Veriphy. Other witnesses, including PA Tisch, also testified that it was their understanding that a culture team or culture nurse would follow up with the patient. When asked what system was in place at the ER for notifying a patient about blood infection results, Allen testified that she would take direction from the doctor; if she was told to call the patient back into the hospital, that is what she would do.

{¶ 33} Allen testified that at the time of Rose's discharge from the ER, her vital signs were good, and Allen would have reported this to Dr. Adolph.

## C. Expert Witnesses

---

[3] Rose's blood test showed that she had a blood infection from gram negative bacteria. Gram negative bacteria is a particular category of bacteria that includes e. coli, klebsiella, pseudomonas, and Acinetobacter. Tr. 1283.

{¶ 34} Dr. Kevin Barlotta ("Dr. Barlotta"), an emergency medicine doctor from Birmingham, Alabama, testified as an expert witness in the plaintiff's case-in-chief. Dr. Barlotta testified that he worked at the University of Alabama Hospital as a professor in emergency medicine, physician director of quality and safety in the emergency department, and critical care transport medical director; he also worked at the Birmingham Veterans Hospital.

{¶ 35} Dr. Barlotta testified that based on Rose's symptoms when she presented to the ER, she likely had an obstructive uropathy — a kidney stone — and an infection, and those things together created a lethal combination. He further testified that a CT scan in the ER would have revealed the kidney stones that were evident in her autopsy, and an ultrasound would have revealed findings that would have indicated obstructing kidney stones. Ultimately, Dr. Barlotta testified that the standard of care would have required that Rose undergo such imaging in the ER, and because no one in the ER ordered such imaging, Dr. Myles and PA Tisch breached the standard of care.

{¶ 36} With respect to sepsis, Dr. Barlotta also testified that over the approximately seven hours that Rose was in the ER, her vital signs showed a concerning trend. Specifically, he testified about Rose's shock index, her pulse pressure increasing, and her mean arterial blood pressure decreasing, all of which indicated a rising concern for sepsis.

{¶ 37} Finally, with respect to the results of Rose's blood test confirming that she had a blood infection, Dr. Barlotta testified that the fact that no one followed up

with Rose regarding these results constituted a breach in the standard of care. Specifically, Dr. Barlotta testified that the typical procedures when lab results come back is that the lab calls someone in the clinic or emergency department, typically a nurse, who will then bring those results to a physician. Dr. Barlotta testified that a physician receiving an indicator that a patient has gram negative bacteria growing in the blood, as happened here, "would be a reason to contact that patient for at least some understanding of a well check." Tr. 438. He went on to testify that, had someone from the ER attempted to contact Rose and was unable to reach her, the typical next step would be to reach out to her emergency contact, or, if nothing else, have police conduct a well check. Dr. Barlotta further testified that based on his education and training, the appropriate step would have been to have the patient come back to the ER for the readministration of IV antibiotics and care.

{¶ 38} Dr. Barlotta testified that different facilities had different procedures for patient notification, but ultimately, he testified that independent of what the specific policy was at the ER, or what the providers understood the policy to be, the standard of care required that someone notify Rose of the results of her blood test. Further, Dr. Barlotta testified that had Rose returned to the hospital at some point on Sunday, or possibly even Monday, and received the appropriate treatment, she would have survived.

{¶ 39} Dr. Jonathan Arden ("Dr. Arden"), a forensic pathologist, testified as an expert witness in plaintiff's case-in-chief. He testified that in this case, he was provided with a variety of materials, including the coroner's investigation,

toxicology reports, and miscellaneous documents documenting the coroner's process from the Lake County coroner; the autopsy report from the autopsy performed in Cuyahoga County; the police report from the Eastlake Police Department; and Rose's medical records. He also reviewed deposition transcripts from Dr. Myles and Tisch before preparing his own report in the case.

{¶ 40} Dr. Arden testified that Rose likely died sometime on Tuesday or Wednesday. Dr. Arden testified that he agreed with the cause of death as listed on the death certificate — sequelae acute pyelonephritis, or kidney stones — but that more specifically, he believed that Rose died from sepsis as a result of the blood infection that arose from pyelonephritis.

{¶ 41} Dr. Nathan Shapiro ("Dr. Shapiro") testified as an expert witness for Lake Hospital. Dr. Shapiro testified that he is an emergency medicine doctor at Beth Israel Deaconess Medical Center in Boston, Massachusetts. With respect to Rose's treatment in the ER on November 10 and 11, 2018, Dr. Shapiro testified that it "was good care that certainly met the standard of care." Tr. 1245. With respect to the "management" of Rose's critical lab alerts, Dr. Shapiro testified that it was also within the standard of care. Tr. 1246. Specifically, on direct examination, Dr. Shapiro testified that the process at the hospital, which is to share critical information with the physician and get direction from him or her, "seems reasonable." Tr. 1246. On cross-examination, Dr. Shapiro testified that patients have a right to know they have a blood infection, and somebody should have followed up on the results with the patient. Dr. Shapiro declined to identify anyone

who should have called Rose in this case, but testified that if he was her attending physician, he would have had someone contact her.  Tr. 1349.

**D. Family Testimony**

{¶ 42} Crnjak testified at trial about his relationship with his mother.  He testified that he went to her house every week for Sunday dinner.  Crnjak testified that on November 11, 2018, he went to her house as usual for Sunday dinner.  He testified that he knocked on the door and there was no answer; when he tried the door, he was surprised to find it locked.  Crnjak testified that he could see through the front door and saw that it looked like Rose was home because there were bags on the table, but the table was not set as it usually was before Sunday dinner.  According to Crnjak, he tried to call his mother; unable to get in touch with her, he decided to go home.  At home, he checked his messages and saw that he had a message from Rose from Saturday evening.  In the message, Rose told Crnjak that she was not feeling well and was going to the hospital, and she would not be having Sunday dinner.  Crnjak testified that Rose sounded normal in the message, and nothing about the message was alarming to him.

{¶ 43} Crnjak testified that he called Rose again on Monday or Tuesday but got no answer.  He testified that on Tuesday or Wednesday, he went back to Rose's house and saw that everything on the table looked the same as it had on Sunday.  At that point, Crnjak thought that Rose might still be at the hospital, so he went to the hospital and asked if she was there.  Crnjak was told that Rose was admitted on Saturday and sent home on Sunday.  Crnjak testified that this concerned him.

{¶ 44} Crnjak testified that his brother, Mark Crnjak ("Mark") called him on Thursday and asked if he had spoken to Rose; Mark was concerned because he had not heard from her throughout the week. At that point, Crnjak called his aunt, Rose's sister Veronica Meek ("Meek") to see if Rose was with her. Meek suggested that they call the police to do a well check. Crnjak testified that he had a key to Rose's house, but he knew that she always set the alarm, and he did not have the alarm code. The family contacted the police to conduct a wellness check, and Crnjak and Meek met the police at Rose's house. The police instructed Crnjak to unlock the door, and when he did so, the alarm did not go off. The police then instructed Crnjak to stay there and proceeded to search the house. Eventually, they came back and informed the family that Rose had passed.

{¶ 45} Crnjak also testified that he was the legally appointed administrator of Rose's estate. On cross-examination, Crnjak testified that the probate court docket showed that the estate was closed in January 2019, that the complaint in this case was filed in May 2020, and that his attorneys applied to reopen the estate in January 2021. On redirect examination, he testified that he hired an attorney to handle the probate court matters, and this attorney handled everything related to the estate "because we had no clue how to handle that." (Tr. 593). He further testified that he had no idea whether the estate was open or closed at the time the underlying case was filed.

{¶ 46} Meek and her husband both testified at trial. Meek testified about her loving relationship with Rose. Meek testified that Rose had worked as a nurse for

years while also taking care of her two sons and disabled husband, who had passed away years ago. Meek testified that Rose was a generally healthy and active woman, and that she and Rose spent time together regularly. According to Meek, Rose was the glue of their family.

{¶ 47} Mark also testified at trial. He testified that his father was a Vietnam veteran who got sick relatively early in Mark's life, rendering him unable to work and essentially forcing Rose to become the primary breadwinner. Mark testified that even though the family did not have a lot of money, Rose always made sure that they had what they needed and had a nice life.

{¶ 48} Mark testified that he got married in 2017 to his wife, Jessica. Jessica also testified at trial. Jessica had children from a previous relationship, and Mark testified that Rose was excited to become a grandmother and was actively involved in his family's life. He testified that he was a veteran, a pipefitter, and in 2018, was in the process of opening his own brewery. He testified that Rose was emotionally and financially supportive of this endeavor and that she attended the soft opening of the brewery on October 25, 2018. Mark testified that the grand opening of the brewery was November 24, 2018. The week leading up to the grand opening, Mark tried to reach out to Rose to confirm the time of the grand opening and make sure that she could attend. He testified that he could not reach her, but this was not that unusual, because she had a flip phone that she would often turn off. After several days, he called his brother to see if he had heard from Rose.

{¶ 49} Mark testified that he lived about an hour away and was on the phone with his brother when the police conducted the wellness check on Rose and discovered that she had passed away. When he learned that his mother had died, Mark immediately drove to her house.

{¶ 50} At the conclusion of Crnjak's case in chief, Lake Hospital moved for a directed verdict, again raising the claimed jurisdictional issue related to Crnjak's alleged lack of standing to initiate the lawsuit. The trial court denied this motion.

{¶ 51} At the conclusion of the defense case, Lake Hospital renewed its motion for directed verdict. The trial court again denied this motion.

{¶ 52} The jury returned a verdict in favor of Crnjak against Dr. Adolph and his employer, Emergency Medicine Physicians of Lake County, Inc., finding that Dr. Adolph's "failure to notify of test results" proximately caused Rose's death. Relevant to this appeal, the jury also returned a verdict against Lake Hospital, finding that Lake Hospital's "inadequate notification policies" were a proximate cause of Rose's death.[4]

{¶ 53} On March 13, 2023, Lake Hospital filed a motion for judgment notwithstanding the verdict, in which it requested that the court vacate the jury's verdict against Lake Hospital, which would necessarily vacate the equal apportionment of fault between Lake Hospital and Dr. Adolph, resulting in Dr.

---

[4] The jury awarded Crnjak a verdict of $6 million and apportioned fault 50% to Dr. Adolph and 50% to Lake Hospital. Because Lake Hospital is the only defendant that appealed, the analysis in this opinion is limited to Lake Hospital and its assignments of error.

Adolph being 100% responsible for the $6 million verdict. On March 27, 2023, Crnjak filed a brief in opposition to Lake Hospital's motion for judgment notwithstanding the verdict. On April 3, 2023, Lake Hospital filed a reply brief in support of its motion. On April 25, 2023, the trial court denied Lake Hospital's motion for judgment notwithstanding the verdict.

{¶ 54} Lake Hospital filed a timely notice of appeal and raises four assignments of error for our review:

> I. The trial court erred in denying defendants' motion for summary judgment with respect to Lee Crnjak's lack of standing to initiate this action.
>
> II. The trial court erred in denying defendant's motions for directed verdict with respect to Lee Crnjak's lack of standing to initiate this action based upon the trial evidence and trial testimony of Lee Crnjak.
>
> III. The trial court erred in denying defendant's motion for judgment notwithstanding the verdict due to Lee Crnjak's lack of standing and the jury's factually and legally insufficient finding of negligence.
>
> IV. The trial court erred by permitting plaintiff's counsel to repeatedly make improper and inflammatory remarks during closing and rebuttal argument.

**Legal Analysis**

**I. Motion for Summary Judgment**

{¶ 55} In Lake Hospital's first assignment of error, they argue that the trial court erred in denying their motion for summary judgment with respect to Crnjak's lack of standing to initiate the action. Specifically, they argue that the entire case is a legal nullity because Crnjak lacked standing to file the action on behalf of Rose's estate.

## A. Standard of Review

{¶ 56} Whether standing exists is a question of law that an appellate court reviews de novo. *Taneff v. HCR ManorCare, Inc.*, 2015-Ohio-3453, 41 N.E.3d 209, ¶ 8 (9th Dist.), citing *State ex rel. N. Ohio Chapter of Associated Builders & Contrs., Inc. v. Barberton City School Dist. Bd. of Edn.*, 188 Ohio App.3d 395, 2010-Ohio-1826, 935 N.E.2d 861, ¶ 10 (9th Dist.).

{¶ 57} Likewise, we review a trial court's summary judgment decision de novo, applying the same standard that the trial court applies under Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Civ.R. 56(C).

{¶ 58} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate the absence of a genuine issue of material fact and entitlement to summary judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party must then point to evidence of specific facts in the record demonstrating the existence of a genuine issue of

material fact for trial. *Id.* at 293. If the nonmoving party fails to meet this burden, summary judgment is appropriate. *Id.*

**B. Analysis**

{¶ 59} Rose died in November 2018. Rose's last will and testament named Crnjak, her oldest son, as the personal representative of her estate. In January 2019, Rose's will was admitted to probate in Lake County and Crnjak, through his probate attorney, managed affairs relating to the administration of the estate. On February 27, 2019, Rose's estate was closed. On May 1, 2020, when Crnjak filed the original complaint in the underlying action, Rose's estate was closed. Seven months later, defendants filed a motion for summary judgment based on the assertion that the case they had been actively litigating was a legal nullity because the estate was not open at the time the case was filed. Notably, the Lake County Probate Court appointed Crnjak as administrator of Rose's estate both in 2019 and when the estate was reopened in 2021.

{¶ 60} Here, the motion for summary judgment was based on defendant's argument that the plaintiff lacked standing to initiate a wrongful death action against them. We begin our analysis by noting that in addressing the amendment of wrongful death complaints, Ohio courts have stressed that "justice abhors the loss of causes of action by pure technicalities." *Stone*, 9th Dist. Summit C.A. No. 15908, 1993 Ohio App. LEXIS 3989, at 8 (Aug. 11, 1993), quoting *Bell v. Coen*, 48 Ohio App.2d 325, 327, 357 N.E.2d 392 (9th Dist.1975). "In that tradition, case law in Ohio illustrates that trial courts liberally permit pleadings to be amended to cure a defect,

so that determinations may be made on the merits." *Id.*, citing *Archdeacon v. Cincinnati Gas & Electric Co.*, 76 Ohio St. 97, 107, 81 N.E. 152 (1907); *Patterson v. V & M Auto Body*, 63 Ohio St.3d 573, 577, 589 N.E.2d 1306 (1992). Specifically, "the wrongful death statute should not be strictly construed, but rather 'is procedural and remedial in nature and should be given a liberal construction.'" *Taneff*, 2015-Ohio-3453, 41 N.E.3d 209, at ¶ 22 (9th Dist.), quoting *Stone* at 2, citing *Kyes v. Pennsylvania RR. Co.*, 158 Ohio St. 362, 109 N.E.2d 503 (1952), paragraph two of the syllabus.

{¶ 61} Crnjak brought a wrongful death claim pursuant to R.C. 2125.01, which provides that "[w]hen the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable if death had not ensued * * * shall be liable to an action for damages." Further, R.C. 2125.02(A) provides that "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent."

{¶ 62} A party must have both standing and capacity to sue to commence a lawsuit. *Mousa v. Mt. Carmel Health Sys.*, 10th Dist. Franklin No. 12AP-737, 2013-Ohio-2661, ¶ 12. Standing to sue is required to invoke the jurisdiction of the common pleas court in every lawsuit, and standing is to be determined at the

commencement of suit. *Id.*, citing *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 24. A person lacks standing unless he has a real interest in the subject matter of the action, and a person has such an interest if he has suffered an injury by the defendant. *Id.*, citing *State ex rel. Walgate v. Kasich*, 2013-Ohio-946, 989 N.E.2d 140, ¶ 11 (10th Dist.).

{¶ 63} Capacity, however, is not a jurisdictional requirement; capacity to sue involves a determination as to whether an individual may properly sue, either as an entity or on behalf of another. *Mousa v. Mt. Carmel Health Sys.*, 10th Dist. Franklin No. 12AP-737, 2013-Ohio-2661, ¶ 13, citing *Natl. City Mtge. v. Skipper*, 9th Dist. Summit No. 24772, 2009-Ohio-5940, ¶ 11.

{¶ 64} With respect to the requirements of R.C. 2152.02(A)(1), Ohio courts have held that "'[t]he real parties in interest in a wrongful death action are the beneficiaries, while the personal representative is a nominal party to the case.'" *Taneff*, 2015-Ohio-3453, 41 N.E.3d 209, at ¶ 14 (9th Dist.), quoting *Cushing v. Sheffield Lake*, 2014-Ohio-4617, 21 N.E.3d 671, ¶ 4 (9th Dist.), citing *Toledo Bar Assn. v. Rust*, 124 Ohio St.2d 305, 2010-Ohio-170, 921 N.E.2d 1056, ¶ 21. As discussed above, R.C. 2125.02(A)(1) provides that surviving children, among others, are the beneficiaries of a wrongful death action. Accordingly, Crnjak is a beneficiary here, and as a beneficiary, he is a real party in interest and thus had standing to bring the wrongful death claim. *Id.*, citing *Reynolds v. HCR ManorCare, Inc.*, 9th Dist. Summit No. 27411, 2015-Ohio-2933, ¶ 14, 16.

{¶ 65} Having determined that Crnjak had standing to bring the underlying wrongful death action, we turn now to the issue of capacity. It is undisputed that at the time Crnjak filed his original complaint in May 2020, the estate was not open and therefore the action was not at that time "brought in the name of the personal representative of decedent" pursuant to R.C. 2125.02(A)(1). Crnjak therefore lacked the legal capacity to assert a wrongful death claim at that time. Because Crnjak lacked capacity at that time, the claims in the initial complaint are void ab initio and would thus be time barred unless his amended complaint relates back to the original date of the filing of the complaint. *Klinger v. Corr. Corp. of Am., Inc.*, N.D.Ohio No. 4:11CV2299, 2012 U.S. Dist. LEXIS 175984, 16 (Oct. 23, 2012).

{¶ 66} Civ.R. 15(C) controls the relation back of amendments and states:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

The rule goes on to provide additional guidance for amendments that specifically change the party against whom a claim is asserted, which does not apply here where the amended complaint did not amend the defendants.

{¶ 67} Civ.R. 17(A), pertaining to parties, provides in relevant part:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for * * * substitution of the real party in interest. Such * * * substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

{¶ 68} While R.C. 2125.02 requires that a person bringing a wrongful death action be a personal representative appointed by a court, the Ohio Supreme Court

has held that a defect in this court-appointed status can be cured even after the statute of limitations has run. In *Douglas v. Daniels Bros. Coal Co.*, the Ohio Supreme Court held that where a widow filed a wrongful death action under the mistaken belief that she had been duly appointed as administratrix, thereafter discovered her error, and amended her petition so as to show that she was in fact appointed administratrix after the application of the statute of limitations, the amended petition related back to the date of the filing of the petition. *Douglas v. Daniels Bros. Coal Co.*, 135 Ohio St. 641, 641, 22 N.E.2d 195 (1939), syllabus. In so holding, the Ohio Supreme Court found that the cause of action set up in the original complaint was in no way affected by the corrections contained in the amendment, because the amendment corrected "the allegations of the petition with respect to plaintiff's capacity to sue and relates to the right of action as contradistinguished from the cause of action." *Id.* at 647. A right of action, according to *Douglas*, is remedial rather than substantive, and an amendment that does not substantially change the cause of action may be made even after the statute of limitations has run. *Id.*, citing 1 Bouvier's Law Dictionary 295; Pomeroy's Code Remedies (5 Ed.), 526 *et seq.*, Section 346 *et seq.*; 1 Cyc., 642.

{¶ 69} Although *Douglas* was decided prior to the adoption of the civil rules and therefore did not specifically address relation back pursuant to Civ.R. 15, we find the facts and reasoning to be entirely applicable here. Other Ohio courts have reached similar conclusions. In *Eichenberger v. Woodlands Assisted Living Residence, LLC*, the Tenth District addressed this issue in the context of a survival

action. *Eichenberger v. Woodlands Assisted Living Residence, LLC*, 2014-Ohio-5354, 25 N.E.3d 355 (10th Dist.). Although there was no person with the legal capacity to commence the action on behalf of the estate at the time the original complaint was filed, the court held that

> [b]y operation of Civ.R. 17(A), the amended complaint * * * had the effect of curing the defect in the original complaint regarding appellant's capacity to sue on behalf of the decedent's estate and, pursuant to Civ.R. 15(C), the amended complaint relates back to the date of the original pleading because the claim asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original.

*Id.* at ¶ 31.

{¶ 70} Further, courts have found that in cases where there is an amendment with respect to a defect in plaintiff's capacity – the issue in this case – "'substitution of parties is the proper remedy, rather than dismissal of the action.'" *Taneff*, 2015-Ohio-3453, 41 N.E.3d 209, at ¶ 24 (9th Dist.), quoting *Stone*, 9th Dist. Summit No. 15908, 1993 Ohio App. LEXIS 3989, at 3 (Aug. 11, 1993), citing *Douglas* at 647.

{¶ 71} Lake Hospital cites a number of cases in support of its argument, none of which are persuasive or entirely applicable here.

{¶ 72} For example, the Ohio Supreme Court in *Ramsey v. Nieman* expressed concern that because permitting a nonappointed person to initiate a wrongful death action would inevitably delay the proceedings because that person could not settle the action unless they first became appointed by the court to be the decedent's personal representative. *Ramsey v. Neiman*, 69 Ohio St.3d 508, 511, 634

N.E.2d 211 (1994).[5] The court was also concerned that allowing a nonappointed person to initiate an action would mean that defendants could face more than one lawsuit and further created the possibility that the action could be brought by someone who might not act in the best interests of the beneficiaries. *Id*.

{¶ 73} No such concerns exist in the instant case. There was no significant delay in this case related to Crnjak's amendment of the complaint, there is no basis to believe that any of the defendants faced multiple lawsuits, and there is no basis to believe that Crnjak was not acting in the best interests of the beneficiaries of Rose's estate. Additionally, we note that *Ramsey* involved a plaintiff who not only was not a duly appointed administrator when he filed the complaint, but "at no time since did he apply to the probate court to be administrator." *Id*. at 508. This is easily distinguishable from the instant case. Not only had Crnjak been previously appointed as administrator of Rose's estate, but as soon as he was made aware of the defect in his complaint, he filed the appropriate paperwork to reopen the estate and sought leave to amend his complaint. Indeed, the *Ramsey* Court declined to

---

[5] The lead opinion in *Ramsey*, which was notably not the majority opinion, affirmed the trial court's grant of summary judgment, finding that a wrongful death action may not be brought by "a person who has not been appointed by a court to be the decedent's personal representative." *Ramsey* at 509. The lead opinion in *Ramsey* was joined by two justices in concurrence and four justices concurring in judgment only; the lead opinion is therefore not the majority opinion in *Ramsey*. The concurring opinion, in which the majority of justices signed on in concurrence, found that R.C. 2152.02(A)(1) does not expressly require that the personal representative be appointed before entering the courthouse to file a wrongful death complaint. *Id*. at 513 (Pfeifer, J., concurring in judgment only). The concurring opinion goes on to note that "summary judgment would provide the appropriate mechanism to screen out plaintiffs who have not received court appointment after filing their complaints" and ultimately concluded that the trial court had properly granted summary judgment, but for the wrong reason. *Id*. at 514.

consider the question of whether the appellant's appointment as administrator would relate back to the date he filed his complaint because it could not decide an issue on a hypothetical set of facts. *Id.* at 513. Thus, Crnjak is clearly not the sort of "non-appointed" person with which the court in *Ramsey* was concerned, and *Ramsey* is not controlling on the issue of whether the amended complaint in this case relates back to the filing of the original complaint.

{¶ 74} Lake Hospital also relies on a Fifth District case, *Gottke v. Diebold, Inc.*, which it claims addressed the exact issue at play in the instant case. *Gottke v. Diebold, Inc.*, 5th Dist. Licking No. CA-3484, 1990 Ohio App. LEXIS 3564 (Aug. 9, 1990). In *Gottke*, the decedent's daughter wanted to file a wrongful death action, but the decedent's husband, who was the appointed administrator, did not want to file such an action. *Id.* The daughter filed a complaint anyway, claiming to be the administrator of her mother's estate. *Id.* The trial court and the appellate court found that the amended complaint would not relate back in these circumstances because the original complaint was based on a deliberate misrepresentation by someone who knew she was not the appointed administrator. *Id.* at 6.

{¶ 75} Lake Hospital attempts to compare this case to *Gottke* by arguing that Crnjak had actual knowledge that no estate existed and that he was not the administrator of the estate. Our review of the record shows a very different scenario than the facts in *Gottke*. The record reflects that Crnjak hired his attorneys to handle the settlement of his mother's estate. The following exchange took place during Crnjak's testimony:

Q: [D]id you have a lawyer help you deal with the probate court?

A: Yes, it was the same lawyer that wrote up the trust and the will and everything, so we figured he would be the one to go to since he knew, he set everything up.

Q: Did you really know what was going on – did you have your lawyer handle everything for you?

A: All of the legal court stuff, yes, we hired him to handle that because we had no clue how to handle that.

Q: And were you aware when this lawsuit was filed that whether the estate was open or closed?

A: I had no idea.

Q: You had the lawyers handle it for you?

A: Yes, all of the lawyers. I really wasn't sure. Yes, they handled all of the legal parts of it. I wasn't sure what was closed or still open or on the paperwork or not.

Tr. 593.

{¶ 76} Further, Lake Hospital makes no argument that Crnjak could not or should not have been the duly appointed administrator at the time the complaint was filed, had the estate been open. We can think of no reason that Crnjak would have deliberately misrepresented his capacity in commencing this action. Perhaps, had Mark been the duly appointed administrator of Rose's estate and refused to commence a wrongful death action, and Crnjak subsequently misrepresented his capacity in order to commence such an action, *Gottke* would be instructive. Because these are not the circumstances in this case, we find that *Gottke* is easily distinguishable.

{¶ 77} Lake Hospital also relies on a recent medical negligence case from this court in support of its argument. In *Smith v. Mentor Ridge Health & Rehab.*, 8th Dist. Cuyahoga No. 112863, 2023-Ohio-4659, a negligence action was initiated in May 2020 in the name of Martha Starcher ("Starcher") alleging that Starcher had been injured in 2019 while she was a resident of Mentor Ridge Health. Appellees responded to the complaint and filed a motion for summary judgment, arguing that the complaint was a nullity because it was filed in the name of Starcher, individually, despite the fact that Starcher was deceased before the complaint was filed and no action was taken to amend the complaint to substitute the estate as the proper party-plaintiff before the statute of limitations expired. *Id.* at ¶ 3. The trial court allowed plaintiffs leave to amend the complaint and denied appellees' initial motion for summary judgment. After the filing of an amended complaint, appellees filed a second motion for summary judgment, which the trial court granted. Starcher, as a decedent, could never have standing.

{¶ 78} The appellant in *Smith* argued that the trial court erred in granting appellees' motion for summary judgment because the amended complaint related back to the original pleading and therefore was not barred by the statute of limitations. This court disagreed, holding that the civil rules provide for substitution of party-plaintiffs, but this does not extend to someone who was deceased at the time the action was initiated and could never have standing. *Id.* at ¶ 29, 30. "Indeed, a deceased person lacks standing to sue." *Id.* at ¶ 30, citing *Harris v. US Bank Natl.*

*Assn.*, 6th Cir. No. 20-2005, 21 U.S. App. LEXIS 27433 (Sept. 10, 2021), quoting *LN Mgmt., L.L.C., JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 950 (9th Cir. 2020).

{¶ 79} *Smith* was decided based on the obvious lack of standing of the original plaintiff. Unlike Crnjak, Starcher lacked standing to sue by virtue of the fact that she was deceased; there was no viable cause of action from the outset. As we discussed above, Crnjak had standing to sue; the original complaint in this case merely reflected a defect in his capacity to sue that was properly corrected.

{¶ 80} Based on the foregoing, we conclude that Crnjak had standing to commence this action. Moreover, we conclude that any defect in Crnjak's capacity to bring this action was cured by the filing of the amended complaint, which related back to the date of the filing of the original complaint, such that the action was not barred by the statute of limitations.

{¶ 81} For these reasons, the trial court did not err in denying Lake Hospital's motion for summary judgment. Therefore, Lake Hospital's first assignment of error is overruled.

## II. Motion for Directed Verdict

{¶ 82} In Lake Hospital's second assignment of error, it argues that the trial court erred in denying its motions for directed verdict with respect to Crnjak's alleged lack of standing to initiate the action based upon the trial evidence and Crnjak's trial testimony.

{¶ 83} We begin by reiterating that, as in the first assignment of error, the substantive issue underlying the motion for directed verdict is one of standing and

capacity. Lake Hospital's motions for directed verdict marked its third attempt to resolve the case on this technical issue.

{¶ 84} The trial court was not persuaded by Lake Hospital's argument in its motion for summary judgment, discussed at length in our analysis of the first assignment of error. Nor was the trial court persuaded by the argument in Lake Hospital's opposition to Crnjak's motion for leave to file an amended complaint pursuant to Civ.R. 15. We note that while Lake Hospital is obviously vigorously maintaining its legal argument as to this issue, at no point has it explicitly challenged the trial court's decision to grant Crnjak leave to amend the complaint.

{¶ 85} We review a trial court's ruling on a motion for directed verdict de novo. *Rybak v. Main Sail, LLC*, 8th Dist. Cuyahoga No. 96899, 2012-Ohio-2298, ¶ 33, citing *Whitaker v. Kear*, 123 Ohio App.3d 413, 422, 704 N.E.2d 317 (4th Dist.1997). Civ.R. 50(A)(4) sets forth the standard for granting a motion for a directed verdict:

> **When granted on the evidence.** When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 86} Lake Hospital largely reiterates the arguments from its first assignment of error in support of its second assignment of error. Our review of the record, including the cross-examination of Crnjak related to the opening, closing, and reopening of the estate, leads us to the same conclusion reached above.

Therefore, the trial court did not err in denying Lake Hospital's motions for directed verdict.

{¶ 87} Lake Hospital's second assignment of error is overruled.

### III. Motion for Judgment Notwithstanding the Verdict

{¶ 88} In its third assignment of error, Lake Hospital argues that the trial court erred in denying its motion for judgment notwithstanding the verdict ("JNOV") due to Crnjak's lack of standing and the jury's factually and legally insufficient finding of negligence.

### A. Standard of Review

{¶ 89} A motion for judgment notwithstanding the verdict challenges the legal sufficiency of the evidence. *Austin v. Chukwuani*, 2017-Ohio-106, 80 N.E.3d 1199, ¶ 19 (8th Dist.), citing *Brady v. Miller*, 2d Dist. Montgomery No. 19723, 2003-Ohio-4582, ¶ 12. In evaluating the denial of a Civ.R. 50(B) motion for JNOV, a reviewing court applies the same test as that applied in reviewing a motion for a directed verdict. *Shields v. Bur. of Workers' Comp.*, 8th Dist. Cuyahoga No. 111774, 2023-Ohio-1368, ¶ 34, citing *Kanjuka v. MetroHealth Med. Ctr.*, 151 Ohio App.3d 183, 2002-Ohio-6803, 783 N.E.2d 920, ¶ 14 (8th Dist.), citing *Grau v. Kleinschmidt*, 31 Ohio St.3d 84, 90, 509 N.E.2d 399 (1987). Specifically, in reviewing a judgment on a motion for JNOV,

> [t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which

reasonable minds may reach different conclusions, the motion must be denied.

*Id.*, quoting *Posin v. ABC Motor Court Hotel*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976).

{¶ 90} Because a motion for JNOV tests the legal sufficiency of the evidence, we review a trial court's ruling on these motions de novo. *Id.*, citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347, 504 N.E.2d 19 (1986).

**B. Analysis**

{¶ 91} Lake Hospital bases its argument for JNOV on two things: Crnjak's alleged lack of standing and the jury's factually and legally insufficient finding of negligence. We have already addressed Crnjak's established standing in the foregoing assignments of error, and based on the foregoing analysis, Crnjak had standing to initiate the underlying action. Therefore, our analysis of this assignment of error will be confined to Lake Hospital's evidentiary argument.

{¶ 92} Lake Hospital centers its argument regarding the jury's verdict around Jury Interrogatory No. 8 because when the jury was asked in this interrogatory "how" Lake Hospital was negligent, the jury crossed out "failure to notify" and responded "inadequate notification policies." According to Lake Hospital, this response is not supported by expert testimony and fails to satisfy the elements of medical negligence.

{¶ 93} In the plaintiff's case against Lake Hospital, it was required to show by a preponderance of the evidence that Lake Hospital deviated from the standard

of care during its treatment of Rose and that this deviation proximately caused Rose's death. A hospital is negligent if it fails to exercise the same degree of care, skill, and diligence that a reasonably careful hospital offers under the same or similar circumstances considering the level of services or skills offered by the hospital and what the hospital knew or should have known about the patient's physical condition, mental capacity, and ability to care for herself.

{¶ 94} Further, in a medical negligence case, "a plaintiff fails to meet its burden of proof where it fails to provide appropriate expert medical testimony demonstrating the defendant failed to adhere to or breached the applicable standard of care." *Tarellari v. CWRU School of Dentistry*, 8th Dist. Cuyahoga No. 84892, 2005-Ohio-2327, ¶ 17, citing *Wawrzyniak v. Zayat*, 8th Dist. Cuyahoga No. 76487, 2000 Ohio App. LEXIS 3759 (Aug. 17, 2000).

{¶ 95} Jury Interrogatory No. 8 asked, "Has plaintiff proved by a preponderance of the evidence that defendant Lake Hospital System, Incorporation was negligent?" If the answer was yes, the interrogatory asked the jury to describe how Lake Hospital was negligent. The jury answered this interrogatory in the affirmative and described that Lake Hospital was negligent by virtue of its inadequate notification policies.

{¶ 96} According to Lake Hospital, no expert testimony was presented at trial regarding Lake Hospital's policies, let alone a notification policy regarding the contact of a patient when laboratory results are received after a patient is discharged.

{¶ 97} Lake Hospital also argues that Crnjak presented no evidence or expert testimony that identified a particular Lake Hospital employee who breached their respective standard of care. This is largely irrelevant to Lake Hospital's appeal. At trial, Crnjak brought two sets of claims against Lake Hospital: (1) indirect claims against Lake Hospital for agency by estoppel, alleging that Dr. Myles, Dr. Adolph, and PA Tisch were agents of the hospital, and (2) a direct claim for negligence against Lake Hospital for failing to notify Rose of her lab results. The jury found against Crnjak on the indirect claims, and in favor of Crnjak on the direct claim of negligence. As such, whether Crnjak established that a specific employee of Lake Hospital breached the standard of care and the hospital was liable — which the jury did not find — has no bearing on this appeal.

{¶ 98} Contrary to Lake Hospital's assertions, ample evidence was presented at trial regarding Lake Hospital's policies regarding patient notification of lab results. Lake Hospital argues that Crnjak's only expert witness as to this issue, Dr. Barlotta, did not testify regarding any Lake Hospital policy or lack thereof. Simultaneously, Lake Hospital argues in its brief that Dr. Barlotta "admitted that Lake Hospital's process included presenting the abnormal lab results to the then ED attending physician" who would then determine further care and treatment and patient follow-up. As evidenced by Lake Hospital's own arguments and our thorough review of the record in this case, Dr. Barlotta presented expert testimony as to the relevant standard of care for Lake Hospital, as well as testimony that Lake Hospital breached this standard of care. Specifically, Dr. Barlotta testified that

someone at the hospital was required to notify Rose or reach out to her in a well check. Tr. 446. Numerous other witnesses, including some of the individuals working at Lake Hospital, testified that Rose would have or should have been contacted. There was also testimony that Lake Hospital's management of the results was reasonable because there was an alleged follow-up plan in place with Dr. Ho, who also would have received the blood test results. Despite this testimony, the record is clear that neither Rose, nor anyone in her family, nor Dr. Ho, were ever made aware of the fact that Rose had a blood infection. Dr. Ho received results from Rose's urinalysis but never received anything pertaining to the blood test. Based on this evidence, the conclusion that Lake Hospital was negligent because of its inadequate notification policies was properly supported.

{¶ 99} We find that sufficient testimony was adduced at trial to find Lake Hospital negligent. Therefore, the trial court properly denied Lake Hospital's motion for judgment notwithstanding the verdict. Lake Hospital's third assignment of error is overruled.

## IV. Closing Arguments

{¶ 100} In Lake Hospital's fourth and final assignment of error, it argues that the trial court erred by permitting Crnjak's counsel to repeatedly make improper and inflammatory remarks during closing and rebuttal argument. Specifically, Lake Hospital argues that Crnjak's counsel violated the "Golden Rule" by appearing to abandon his position of impartiality and place himself in the place of the plaintiffs, cited the incorrect standard of care, and suggested that the jury's verdict and

potential damages award should be based on Lake Hospital's status as a medical corporation.

## A. Standard of Review

{¶ 101} It is well-settled that counsel is accorded wide latitude in opening statements and closing arguments subject to the restriction that it is impermissible to comment on incompetent, inadmissible, or improper evidence that is patently harmful. *Waechter v. Laser Spine Inst., LLC*, 2023-Ohio-3715, 226 N.E.3d 457, ¶ 50 (8th Dist.), citing *Hunt v. Crossroads Psych. & Psychological Ctr.*, 8th Dist. Cuyahoga No. 79120, 2001 Ohio App. LEXIS 5388, 7-8 (Dec. 6, 2001), citing *Dillon v. Bundy*, 72 Ohio App.3d 767, 772, 596 N.E.2d 500 (10th Dist.1991), citing *Maggio v. Cleveland*, 151 Ohio St.136, 84 N.E.2d 912 (1949), paragraph two of the syllabus, *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraphs two and three of the syllabus, and *Drake v. Caterpillar Tractor Co.*, 15 Ohio St.3d 346, 348, 474 N.E.2d 291 (1984).

{¶ 102} This court has explained that the determination of whether or not the proper bounds of closing arguments have been breached "'is a pure function of the trial court, therefore, this court must look at the trial court's ruling under an abuse of discretion standard.'" *Id.*, quoting *Hunt v. Crossroads Psych. & Psychological Ctr.*, citing *Kubiszak v. Rini's Supermarket*, 77 Ohio App.3d 679, 688, 603 N.E.2d 308 (8th Dist.1991). Thus, it is "[o]nly if the circumstances are of such reprehensible and heinous nature as to constitute prejudice" that we will reverse a judgment on this basis. *Id.* Additionally, the failure to raise a timely objection

generally "'prevents reversal absent gross and persistent abuse of counsel's privilege in closing argument.'" *Id.*, quoting *Di v. Cleveland Clinic Found.*, 2016-Ohio-686, 60 N.E.3d 582, ¶ 106 (8th Dist.).

**B. Analysis**

{¶ 103} Lake Hospital first argues that counsel violated the golden rule by stating:

> You ever have that experience where you think about somebody, you're in a moment, wow, my mom would have loved this. I could use my mother right now. That's the mental anguish that gnaws at you because she should be here. She should be here.

Tr. 1713.

{¶ 104} Lake Hospital is correct that "[a] 'Golden Rule' argument exists where counsel appeals to the jury to abandon their position of impartiality by placing themselves in the place of one of the parties." *Cooley v. Leaseway Transp. Co.*, 8th Dist. Cuyahoga Nos. 62198 and 62732, 1993 Ohio App. LEXIS 2631, at 16 (May 20, 1993), citing *Boop v. The Baltimore & Ohio RR.*, 118 Ohio App. 171, 193 N.E.2d 714 (3d Dist.1963). It is also correct that "this type of argument is no longer per se prejudicial so as to warrant a new trial." *Id.*, citing *Dillon v. Bundy*, 72 Ohio App.3d 767, 775, 596 N.E.2d 500 (10th Dist.1991).

{¶ 105} Reviewing the record, it is clear that the comments referenced by Lake Hospital were made in reference to the jury's responsibility to assess the different kinds of damages available under Ohio's wrongful death statute. Further, counsel did not explicitly ask the jurors to value the life of their own mothers.

Moreover, we note that this argument relates to the jury's award of damages, which Lake Hospital has not appealed.

**{¶ 106}** Lake Hospital next argues that counsel cited the incorrect standard of care when he stated, "When the danger goes up, you've got to be more careful. Anybody driving in this morning knew that, right?" Tr. 1689. This statement was part of counsel's statement regarding the applicable standard of care, in which he stated, correctly, that the standard contemplated what a reasonably careful physician would do. Further, this statement was made in the context of arguing that Lake Hospital and its physicians were negligent for failing to order a CT scan and telling Rose it was safe to go home despite the clinical suspicion of a life-threatening condition being present in her diagnosis. We note that while the standard of care applies to all of Crnjak's claims about the hospital, this statement was particularly referencing Lake Hospital's initial treatment of Rose in the ER, for which it was not found negligent.

**{¶ 107}** Regardless, counsel's statement correctly summarizes the law. "[T]he standard of care applicable to medical professionals is to exercise the degree of care that a medical professional of ordinary skill, care, and diligence would exercise *under similar circumstances*." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 27, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus (emphasis added). Thus, the particular circumstances, including the particular danger, is relevant in determining the appropriate standard of care. *See also Spence*

*v. Tanner*, 5th Dist. Tuscarawas No. 2005AP070050, 2006-Ohio-820, ¶ 12 ("The amount of care increases in proportion to the danger that reasonably should be foreseen.").

{¶ 108} Finally, Lake Hospital argues that counsel improperly referred to Lake Hospital's status as a medical corporation when he stated:

> And then we get into the verdict form, and one of the jobs you're going to have to do is to ascribe the percentage of negligence as between all the defendants. Understanding that it's the medical corporation that is going to be responsible for these three folks.

Tr. 1711.

{¶ 109} First, we note that Lake Hospital is in fact a medical corporation. Second, part of Crnjak's claims against Lake Hospital — which were ultimately unsuccessful at trial — is that Lake Hospital was liable for the actions of providers working in the ER. Finally, there were numerous defendants in this case; some of the defendants, like Lake Hospital, were medical corporations, and some of them were medical professionals. The complicated relationships of all of these entities and individuals, to each other and to the plaintiff, was repeatedly testified to at trial by a number of witnesses. While Lake Hospital attempts to characterize counsel's statement as "a clear attempt to minimize the gravity and stakes of finding against the defendants" by suggesting that Lake Hospital has "deep pockets," our review of the record reveals that it was merely an attempt to emphasize the relationship of Dr. Myles, Dr. Adolph, and PA Tisch to Lake Hospital.

{¶ 110} None of the statements pointed to by Lake Hospital were of such a heinous nature to have prejudiced Lake Hospital. The trial court did not abuse its discretion in permitting these statements in closing arguments. Therefore, Lake Hospital's fourth assignment of error is overruled.

{¶ 111} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR